Charles A. **JOYCE**, Joseph C. Matesic, Richard A. Samer and Vernon P. Taylor, for themselves and all other persons similarly situated, Plaintiffs,

v.

**CURTISS–WRIGHT CORPORATION,** Defendant.

No. 89–CV–1599C.

United States District Court, W.D. New York.

Dec. 30, 1997.

E. Joseph Giroux, Jr., Buffalo, NY, for Plaintiff.

O'Melveny & Meyers LLP (Robert N. Eccles, of Counsel), Washington, DC, for Defendant.

## DECISION and ORDER

CURTIN, District Judge.

### BACKGROUND

Plaintiffs commenced this class action against Curtiss–Wright Corporation ("Curtiss–Wright") in December 1989 under section 502 of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1132 ("ERISA") and Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"). Plaintiffs are a class of retired Curtiss–Wright employees who were represented by the United Steelworkers of America ("United Steelworkers"). Plaintiffs currently seek a determination that Curtiss–Wright breached its collective bargaining agreement ("CBA") with the United Steelworkers and violated ERISA when it terminated retiree health insurance benefits for class members in May 1987. Plaintiffs seek not only damages for the breach of the CBA, but specific performance of lifetime retiree health insurance through a permanent injunction prohibiting Curtiss–Wright from terminating retiree health benefits for class members in the future. The central question is whether the health insurance benefits were vested for the lives of plaintiff retirees. If the benefits were vested, then they could not be terminated unilaterally by defendant, and plaintiffs are entitled to relief. If they were not vested, then plaintiffs are not entitled to any relief.

On December 17, 1992, this court denied the parties' cross-motions for summary judgment, finding that the language contained in the 1968–71 CBA and attached insurance

agreement referring to the duration of coverage for retirees is ambiguous and that the intent of the parties cannot be determined from a plain reading of these documents (Item 48). *Joyce v. Curtiss–Wright Corp.*, 810 F.Supp. 67, 73 (W.D.N.Y.1992). This court further found that the extrinsic evidence presented by both sides demonstrated that there was a genuine issue of fact concerning the intent to vest retiree benefits. *Id.* The court subsequently ruled that the trial of this case should be bifurcated as to liability and damages. The court further ruled that plaintiffs were entitled to a jury trial on the alleged breach of the CBA, but that plaintiffs' ERISA claim and claim for injunctive relief was not triable before a jury (Item 93).

The court conducted a jury trial from April 22, 1996, to May 7, 1996. On May 7, 1996, the jury returned a special verdict answering each of the following two questions in the affirmative:

1. Did the United Steelworkers of America and Curtiss–Wright Corporation, the parties to the collective bargaining agreement, intend that the agreement would require Curtiss–Wright Corporation to continue to provide medical insurance coverage to retirees after the collective bargaining agreement expired?

2. Did Curtiss–Wright breach the agreement by failing to pay premiums for retirees' health insurance between May 1, 1987, and July 27, 1987?

On June 4, 1996, this court entered judgment in favor of the plaintiffs (Item 123). On July 10, 1996, the court vacated this judgment, realizing that the judgment had been entered in error (Item 128).

On June 18, 1996, plaintiffs filed a motion seeking (1) a permanent injunction enjoining defendant from terminating or reducing retiree health insurance benefits for the lifetime of the class members; (2) an order entering judgment finding that the plaintiff class members are entitled to benefits pursuant to ERISA, and that defendant's termination of retiree health insurance benefits from May 1, 1987, to July 23, 1987, violated its fiduciary duty to class-member partici-

pants under ERISA; (3) an order scheduling further proceedings on the amount of damages due to plaintiffs as a result of defendant's breach of its CBA and breach of its fiduciary duty when it terminated health insurance for retiree class members from May 1, 1987, to July 23, 1987; and (4) an award of attorneys' fees and costs pursuant to both ERISA, 29 U.S.C. § 1132(g)(1), and Fed. R.Civ.P. 54(d)(2) (Item 124).

Defendant does not oppose an order scheduling further proceedings on the amount of damages; however, it suggests that such proceedings be deferred until plaintiffs have assembled, and defendant has had a chance to review, the evidence that would be used to prove such damages, and the parties have then conferred to determine whether further proceedings are necessary. Defendant opposes the three other items of relief requested in plaintiffs' motion, and urges the court to deny plaintiffs' request for a permanent injunction, and enter judgment dismissing plaintiff's claims under ERISA. More specifically, defendant urges the court to find that the retirees' health insurance benefits were not lifetime benefits, but were limited to the specific durational term of the CBA, contrary to the jury's special verdict.

Defendant has not asked the court to reverse the jury's verdict as a matter of law. At oral argument, defendant explained that the jury verdict was merely a finding that defendant had violated the CBA and that the question remaining for the judge involves equitable remedies and defendant's liability for the future health care costs of the class members.

The parties entered into a stipulation, that was signed by this court on July 24, 1996, in which defendant agreed not to terminate retiree health insurance benefits before midnight on September 30, 1996 (Item 130). This stipulation was necessary because the CBA then in effect was to expire on August 31, 1996. The parties acknowledged that by entering into this stipulation, defendant did not admit that it has a duty to continue retiree health insurance benefits after August 31, 1996, and that defendant's continuation of such benefits would not be used as evidence that retired employees had any

right to the continuation of their health insurance benefits. At oral argument, defendant explained that it has continued to pay the retirees' health benefits during the pendency of this litigation.

Both sides have supplied the court with numerous memoranda, affidavits, and case authority in support of their positions on the pending motion. They appeared before the court for oral argument on July 22, 1997.

## FACTS

The United Steelworkers and its Local Union 4533 were the exclusive collective bargaining representatives for production and maintenance employees employed by defendant, including the plaintiff class members prior to their retirement from Curtiss–Wright. In 1965, Curtiss–Wright and the United Steelworkers Local 4533 negotiated a CBA which gave paid insurance benefits to retirees. The CBA stated:

> Group Life, Hospital and Surgical, and other applicable insurance benefits are covered in a separate Insurance Agreement which will be attached to and become a part of the Agreement as Exhibit "A."

(Joint Exhibit 7, p. 52, ¶ 190). The Group Insurance Agreement ("GIA") provided retirees and their eligible dependants with certain medical, surgical, hospital, and health-care benefits (Joint Exhibit 1, pp. A–3, B–7 – B–9). This insurance program became effective on July 1, 1966, and it was limited to retirees receiving an early or disability pension under the Curtiss–Wright Pension Plan. The insurance continued until the retiree/dependent died or became eligible for Medicare benefits, whichever occurred first (Item 131, ¶ 16; Joint Exhibit 1, p. B–9).

The 1965 GIA provided for a right of conversion for employees and the spouses of formerly insured retirees to an individual health insurance policy without evidence of insurability in the event of termination of his/her group health insurance (Joint Exhibit 7). The agreement did not provide for conversion rights for retirees. Under the Curtiss–Wright Pension Plan, an employee could retire as early as age 55.

Curtiss–Wright distributed a booklet bearing the date 5/66 describing the health insurance for employees, retirees, and dependents of employees and retirees (Joint Exhibit 18). This booklet explained that the insurance would terminate for the retiree or the retiree's dependent when or if (1) the retiree or the dependent reached Medicare age, (2) the retiree died, or (3) the group policy terminated (Id., Part II, p. 4). The booklet also explained the conversion rights that existed for a retiree's dependents, but it did not describe any conversion rights for the retiree (Id.).

Both the 1965 CBA and the 1965 GIA contained general durational clauses specifying that each agreement would terminate at midnight on November 3, 1968 (Joint Exhibit 1, p. 5; Joint Exhibit 7, p. 55). Neither agreement explains how these general durational clauses affect the specific provision for retiree health coverage until the death of the retiree or the insured's reaching of Medicare age, which are both events that could occur beyond the general durational limits of the agreements.

In 1968, Curtiss–Wright and the United Steelworkers Local 4533 negotiated a new CBA. Once again, the CBA stated:

> Group Life, Hospital and Surgical, and other applicable insurance benefits are covered in a separate Insurance Agreement which will be attached to and become part of the Agreement as Exhibit "A."

(Joint Exhibit 8, p. 47, ¶ 191). The 1968 GIA changed the coverage for retirees providing:

> Effective November 4, 1968, this insurance, which was formerly referred to as Post Retirement Group Hospital–Medical–Surgical Insurance, will be provided for employees receiving or becoming entitled to receive pension payments under The Curtiss–Wright Pension Plan by reason of the normal, automatic, early or disability retirement provisions of such Plan.

(Joint Exhibit 2, p. B–11). This insurance agreement specified three conditions under which health coverage would not be provided: (1) to the extent a retiree was covered under another group policy, including Medicare; (2) in the event the retiree moved to a foreign

country; and (3) in the event the retiree died.

The GIA provided for a conversion benefit for employees when their insurance was terminated and for spouses and eligible dependents in the event of a retiree's death (Joint Exhibit 2, p. B–12). As with the 1965 agreement, the 1968 agreement did not provide for any conversion rights for retirees covered by the insurance, nor did it include any express language about the duration of retiree health insurance benefits (*see* Item 146, pp. 200–01). The 1968–71 CBA contained a general durational clause which stated that "[t]he terms and conditions of this Agreement shall continue in effect until midnight, October 31, 1971." (Joint Exhibit 8, p. 51, ¶ 209). A similar clause with the same date appeared at the end of the GIA.

At trial, Curtiss–Wright negotiator J.T. Wright testified that he had no recollection of negotiating health insurance benefits during the 1968 negotiations (Item 147, pp. 347–48). He further testified that he did not recall that the agreements provided health insurance for retirees (*Id.,* p. 362). Curtiss–Wright negotiator Art Clark testified that between 1968 and 1971, he understood that retiring employees had lifetime health insurance benefits (*Id.,* p. 419). He based this understanding on a document prepared by Curtiss–Wright which described retiree benefits as:

> All current retirees and their dependents and all future retirees and their dependents will be covered for Hospital Surgical Medical Insurance benefits fully paid by the Company. Such benefits will be the same as the benefits for active employee, except for drugs, dental care and major medical. For retirees and dependents over 65, the benefits will be integrated with Medicare Parts A & B.

(Item 131, ¶ 25 (citing Plaintiff's Exhibit 1)).

With one brief exception in 1984, the United Steelworkers and Curtiss–Wright entered into three-year CBAs and GIAs from 1968 to 1987. The GIA's clauses concerning retiree benefits remained essentially unchanged between 1968 and 1984, providing continuous coverage for the retirees. The expiration date was changed for each agreement, although the 1971–74 insurance agreement simply stated that it "shall continue in effect until midnight," without providing a date or period at the end of the sentence. In the 1984–87 GIA, the language was changed to limit retiree health coverage for persons retiring after October 31, 1983. Specifically, in order to be eligible for retiree health benefits, a retiree between the ages of 62 and 65 had to have attained at least twenty years of credited service, and a retiree age 65 or older had to have attained at least 15 years of credited service (Item 131, ¶¶ 31–32 (citing Joint Exhibit 22)). The 1984–87 insurance agreement did not refer to those employees who had retired prior to October 31, 1983, who were already receiving retiree health insurance. Those retirees continued to receive retiree health insurance after the 1984–87 agreement went into effect (Item 131, ¶ 32).

Defendant published and distributed a series of summary plan descriptions ("SPDs") to the bargaining unit employees during the years in question. One such booklet, entitled "Your Plan of Group Post Retirement Health Insurance," dated 6/70, stated under the heading "Termination of insurance:" "Your insurance, or that of a dependent, will terminate in the event of your death, or if the Group Policy terminates." (Joint Exhibit 19). Plaintiffs assert that this SPD did not contain a provision stating that the insurance will terminate upon the expiration date of the CBA (Item 131, ¶ 27).

At some date after the enactment of ERISA (September 1, 1974), defendant distributed to employees and retirees an additional SPD, entitled "Employee Benefits Plan," which was prepared and distributed to comply with ERISA (*Id.,* ¶ 30 (citing Joint Exhibit 15)). The booklet contained a section entitled, "Continuation of Health Care Benefits." which provided:

> After You Retire—During your retirement, you and your covered dependents will have the same Basic Health Care coverage as you had while active at no cost to you. You will not, however, be covered under the dental, major medical or prescription drug plans.

The Plan will not duplicate any benefits to which you are entitled under Medicare. Once you or your dependent become eligible for Medicare, the Plan will assume that you are covered by both Part A and Part B of Medicare and will pay only the complimentary coverage....

If you die during retirement, your dependent's coverage continues for 180 days from the date on which you died if your dependents elect to pay the monthly insurance premium. Your dependents will then have 31 days to apply for an individual policy with either the Prudential Insurance company or the Blue Cross Plan or Claims Service Organization.

(Joint Exhibit 15, p. 53). This booklet further explained:

Plan Continuation—The Company expects and intends to continue this Plan indefinitely but reserves the right to end or amend it. The benefits in this booklet are of a contractual nature, and they may be modified from time to time or terminated as a result of contractual negotiations.

This booklet is not a contract and contains only a general description of your benefits under the Curtiss–Wright Health Care Plan. These benefits are subject to the terms, conditions, and limitations of the Master Contracts issued to your group by the Claims Service Organizations, and to the provisions of applicable State Laws.

(Joint Exhibit 15, p. 58).

Beginning in 1979, Curtiss–Wright sent summary annual reports to each participant in the company health plan, including retirees. Those annual reports contained the following paragraph: "The medical benefits plan under which you are now covered is provided to you under the terms of a Collective Bargaining Agreement. Accordingly, termination of the Collective Bargaining Agreement for any reason, shall result in termination of the medical coverage provided by such agreement." (See, e.g., Defendant's Exhibit 3).

In 1974, the CBA expired without the parties' reaching a new agreement, and the active employees went on strike. At that time, defendant notified the active employees of its intention to cancel their benefits (Plaintiff's Exhibit 43). Defendant neither notified nor attempted to cancel the benefits of the retirees. The strike lasted for approximately one month (Item 146, p. 196).

At trial, plaintiff attempted to demonstrate through extrinsic evidence that the parties negotiating the CBAs and insurance agreements had intended for retiree health benefits to continue throughout the retirees' lives. Three class member retirees, Vernon Taylor, Joseph Matesic, and Richard Samer, testified that the personnel officer with whom they each met prior to retiring did not say anything about the circumstances under which their health insurance would ever terminate (see Item 145, pp. 50, 68, 77, 87, 102). Mr. Taylor said that the personnel officer explained that his health insurance would remain in effect until his death. (Id., p. 50). Plaintiffs also read into the record the deposition testimony of Charles Joyce, who was deceased at the time of the trial. Mr. Joyce was a member of the Curtiss-Wright Joint Pension Board, and had been involved in the negotiations for many of the CBAs and insurance agreements. Mr. Joyce understood that retiree health benefits were to continue throughout the retirees' lives (Id., p. 107). He said that during negotiations, the union gave up wage increases because they were getting health benefits for life. But he conceded that these assurances were verbal and that there was no confirming written agreement (Item 146, p. 169). Mr. Joyce often accompanied employees at exit interviews with personnel officers when retirement benefits were discussed. He said that the personnel officers never contradicted him when he told the employee that he would have health insurance for life (Id., pp. 173, 161–163, 182).

Daniel Urbanczyk, a Curtiss–Wright bargaining unit retiree and an active member of the United Steelworkers, had participated in the negotiations for several of the CBAs between Curtiss–Wright and the United Steelworkers. He claimed that he heard Mr Joyce tell retirees, in the presence of personnel officers, that their health insurance benefits would continue for the remainder of their lives (Id., p. 194). He said that during the one-month strike in 1974, defendant suspend-

ed the active employees' health benefits, but did not suspend the health benefits of retirees (*Id.*, pp. 196–197).

Claude Poulin, an enrolled actuary, who worked as a staff member of the United Auto Workers from 1969 to 1980 advising the union during negotiations, testified as an expert witness for plaintiffs. He had the impression that all plans that included health benefits provided for lifetime health insurance (*Id.*, pp. 258–262).

Defendant presented the videotaped depositions of Bruno Laudi and Jefferson Wright, and the live testimony of Arthur Clark, each of whom worked for Curtiss–Wright in its personnel/labor relations department and participated in the negotiations of various CBAs. Each man testified that the parties had not specifically negotiated the question of the duration of retiree health benefits and that they never heard either personnel officers or union officials tell retirees that they would have lifetime health insurance (Item 147, pp. 334, 339, 352–57, 413, 418–19).

Ronald Moore, an enrolled actuary who had worked with Curtiss–Wright in 1968 helping the company value its pension plan by determining the company's liabilities and the annual funding requirements of the pension plan (*Id.*, p. 370), explained how the company had created a trust fund system for funding its pension plan. He said that nothing is guaranteed in pension plans. He further stated:

> [T]o the extent there was enough money in the trust fund to cover retirees' benefits then somebody might loosely say benefits were guaranteed. As an actuary, I would not want to say benefits are guaranteed because there is a probability that assets will not return what they are expected to return. Any number of things could happen that would make a guarantee of lifetime pension benefits problematic.

(*Id.*, p. 382). However, on cross-examination, Mr. Moore testified that a pension plan such as Curtiss–Wright's is set up so that the benefits can be provided for the rest of each retiree's life (*Id.*, p. 398). He further explained that there were enough assets in the plan to cover benefits for retirees (*Id*). On re-direct, Mr. Moore stated that there was no

provision in the insurance plan that guaranteed lifetime benefits (*Id.*, p. 400).

On May 1, 1987, the CBA between the United Steelworkers and Curtiss–Wright terminated, and Curtiss–Wright locked out bargaining unit employees (Items 131, ¶ 33; 146, p. 196). On or about May 5, 1987, defendant notified retirees that their health insurance had been terminated effective May 1, 1987 (Item 131, ¶ 34; Joint Exhibit 20). On May 1, 1987, there were 191 retirees covered by retiree health insurance. Approximately sixty-two of these retirees self-paid their premiums for the period defendant terminated their insurance (Item 131, ¶ 35). On July 27, 1987, the United Steelworkers and Curtiss–Wright reached a new CBA, and Curtiss–Wright reinstated health insurance for retirees (*Id.*, ¶ 36; Joint Exhibit 21). The United Steelworkers filed a grievance over the termination of health insurance for retirees; however, Curtiss–Wright would not arbitrate the grievance on the ground that retirees did not have the right to file a grievance under the contract (*Id.*, ¶ 37; Item 146, pp. 203–04).

Defendant sold its Buffalo, New York, facility on or about June 1, 1995. The final CBA between Curtiss–Wright and the United Steelworkers expired on midnight on August 31, 1996. Because of the sale of the facility, the United Steelworkers no longer represent any employees of Curtiss–Wright (Item 131, ¶ 38).

At present, there are ninety-seven class-member retirees covered by retiree health insurance paid for by Curtiss–Wright (*Id.*, ¶ 41).

### DISCUSSION

**I.** *Plaintiffs' Motion for Judgment that they are Entitled to Lifetime Health Benefits and for a Permanent Injunction Guaranteeing that Entitlement*

Plaintiffs contend that the evidence at trial, as reflected in the jury's special verdict, supports a finding that the parties to the CBAs and the insurance agreements bargained for retiree health insurance benefits that lasted beyond the expiration of the CBA: that is, for the lifetime of each retiree

(Item 125, p. 8). Because intervening authority limits the evidence the court may now consider, the court does not so find. The court may no longer consider the extensive extrinsic evidence heard at trial, especially the numerous oral discussions about lifetime benefits.

## A. Vesting of Retiree Medical Benefits

It is well established that under ERISA, medical benefits and any other benefits provided by a welfare plan to employees and retirees generally are not vested, and an employer can amend or terminate such a plan at any time. *American Federation of Grain Millers v. International Multifoods Corporation,* 116 F.3d 976, 979 (2d Cir.1997) (citing *Inter–Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.,* 520 U.S. 510, 117 S.Ct. 1513, 1516, 137 L.Ed.2d 763 (1997); *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995); *Schonholz v. Long Island Jewish Medical Center,* 87 F.3d 72, 77 (2d Cir.1996)). The rule under section 301 of the LMRA is similar: "after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA." *International Multifoods,* 116 F.3d at 979 (citing *Litton Fin. Printing Div., a Div. of Litton Bus. Sys. v. NLRB,* 501 U.S. 190, 207, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991)). Under both ERISA and the LMRA, if an employer promises vested benefits, that promise will be enforced. *International Multifoods,* 116 F.3d at 980. The problem for courts has been determining exactly what language is required to create a promise to vest retiree medical benefits.

All courts agree that if a document unambiguously indicates whether retiree medical benefits are vested, the unambiguous language should be enforced. *International Multifoods,* 116 F.3d at 980. When a court finds that the documents are ambiguous as to whether retiree medical benefits are vested, then it may look outside the documents to determine whether the benefits are vested. Thus, the threshold ambiguity analysis will have a significant impact on both the breadth of evidence the court may consider and the ultimate outcome. The circuits have been split as to how such documents should be interpreted. At the time this court considered the parties' motions for summary judgment and found the pertinent documents to be ambiguous, this circuit had not articulated a standard for the interpretation of CBAs and insurance plan documents.

In June 1997, the Second Circuit articulated a clear standard when it affirmed Judge Elfvin's holding granting summary judgment for an employer that had modified its program for medical benefits for retirees. *International Multifoods,* 116 F.3d at 976. In that case, the employer agreed in each of its CBAs to provide its retirees with medical insurance at no cost to the retirees. When all of the CBAs expired, the employer continued to pay the entire premium required to provide medical insurance to retirees. Then in 1992, the employer amended its plan and required the retirees to pay a portion of the premiums. Judge Elfvin found that none of the documents relied on by the plaintiffs contained a promise to provide the retirees with vested benefits. In affirming Judge Elfvin's opinion, the Court of Appeals explained that:

> In this Circuit, to reach a trier of fact, an employee does not have to 'point to unambiguous language to support [a] claim. It is enough [to] point to written language *capable of reasonably being interpreted* as creating a promise on the part of [the employer] to vest [the recipient's] ... benefits.'

*International Multifoods,* 116 F.3d at 980 (quoting *Schonholz,* 87 F.3d at 78) (emphasis in the original).

The court then examined the CBAs and the ERISA plan documents involved in the case in light of that standard. The court noted that each CBA provided for medical benefits "[d]uring the term of this Agreement," and explained that "promising to provide benefits for a *certain period of time* necessarily establishes that once that time period expires, the promise does as well." *International Multifoods,* 116 F.3d at 981 (citing *LTV Steel Co. v. United Mine Workers of America (In re Chateaugay Corp.),* 945 F.2d 1205, 1208 (2d Cir.1991) (holding that a

CBA provision which "guaranteed" retiree medical benefits "during the term of this Agreement" established that retiree "health benefits were no longer guaranteed" once the agreement expired)). The court then concluded that this provision unambiguously established that once the CBAs expired, the defendant was free to reduce retiree medical benefits. *International Multifoods,* 116 F.3d at 981–82. The court further instructed that the plaintiffs could not rely on extrinsic evidence to prove that the defendant promised vested benefits to its retirees, because "extrinsic evidence cannot alter the meaning of unambiguous terms." *Id.* At 981 (citation omitted). As for the ERISA plan documents, the court found that because these documents explicitly provided that the plan could be amended at any time, without the consent of the insured employees or any other person having a beneficial interest in it, the ERISA plan did not promise vested benefits. *Id.,* at 982. The court found that the SPDs similarly did not promise vested benefits.

## B. Ambiguity of the CBA and Insurance Plan Documents

Defendant argues that the court should reexamine and reverse its 1992 decision that the language contained in the 1968–71 CBA and attached insurance agreement referring to the duration of coverage for retirees is ambiguous in light of *Schonholz* and *International Multifoods,* as well as the evidence presented at trial (Item 137, p. 3).

### 1. *The Law of the Case*

█ The law-of-the-case doctrine provides that when a court has decided upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case. *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). In *North River Insurance Co. v. Philadelphia Reinsurance Corp.,* 63 F.3d 160 (2d Cir.1995), the Second Circuit explained that "[i]t is generally accepted that the law of the case doctrine does not limit the power of a court, but 'merely expresses the practice of courts generally to refuse to reopen what has been decided.'" *Id.,* at 164–65 (citations omitted). The court acknowledged that a "court may depart from the law of the case where a fundamental change in the governing law impacts directly upon the parties' rights and obligations." *Id.* at 165. However, the court cautioned that such an exception to the doctrine should only be applied "when the court has a clear conviction of error with respect to a point of law on which its previous decision was predicated." *Id.,* (citing *Fogel v. Chestnutt,* 668 F.2d 100, 108 (2d Cir.1981) (citations and internal quotations omitted)).

█ The question of whether particular documents are ambiguous is a question of law. Until now, this court resolved the issue as best it could with the available precedent at hand. In finding the plan documents ambiguous, the court expressly stated that the Second Circuit had not specified what a collective bargaining agreement must contain in order for a court to find an intention to vest retiree health insurance benefits, and that the general approach to contract interpretation under federal labor law has consistently been one of flexibility in considering evidence outside the parameters of the written agreement. *Joyce,* 810 F.Supp. at 72. Nevertheless, after the jury trial and verdict, the Second Circuit announced a more narrow standard by which courts within the circuit are to interpret CBAs and insurance plan documents. It is now clear that a district court may not base its finding of ambiguity on the absence of language, and the court may only consider oral statements or other extrinsic evidence after it first finds language in the documents that may reasonably be interpreted as creating a promise to vest benefits. Consequently, the court finds that it must reexamine these documents in light of *Schonholz* and *International Multifoods.*

### 2. *The CBAs and Insurance Plan Documents*

█ Defendant contends that the durational clauses in the agreements creating the benefits at issue, which provided that the agreements "shall continue in effect" for a certain period, "necessarily establishes that once that time period expires, the promise does as well." (Item 151, p. 5). Defendant

also asserts that plaintiffs' argument for vesting rests on the absence of language expressly referring to termination of retiree benefits, and that under *International Multifoods* such an argument is insufficient to support a claim for vesting, since plaintiffs must point to written language that can reasonably be interpreted as creating a promise of vesting (*Id.*). Defendant explains that *International Multifoods* instructs that inferences based on the absence of language or the lack of certain rights for retirees does not constitute "written language" which can reasonably be interpreted as creating a promise of vesting (*Id.*, p. 6). In addition, defendant notes that in its order denying the parties' motions for summary judgment, this court recognized that the benefits at issue were described in the summary annual reports that were sent to each participant in the company medical plan, including retirees, and that these reports expressly reserved Curtiss–Wright's right to terminate benefits (*see Joyce*, 810 F.Supp. at 69–70).

Defendant submits that Judge Lifland's (U.S. District Court for the District of New Jersey) unreported decision in *International Union, United Automobile, Aerospace and Agricultural Workers of America v. Curtiss–Wright Corp.* ("*UAW*") provides this court with persuasive authority that the CBAs and insurance agreements in the present case did not vest lifetime retiree medical benefits (Item 142). In *UAW*, Judge Lifland held that Curtiss–Wright was entitled to terminate the retiree health benefits at issue after the expiration of a CBA and General Insurance Agreement that had provided such benefits. The district court had previously denied Curtiss–Wright's motions for summary judgment, finding that the provisions in the agreements were ambiguous with regard to vesting of the benefits; however, Judge Lifland found that that conclusion was untenable in light of intervening authority (Item 142, Exhibit A, pp. 104–5). Defendant contends that the Third Circuit's intervening authority upon which Judge Lifland relied is consistent with *Schonholz* and *International Multifoods* (Item 142, p. 5; Item 151, p. 6).

As defendant correctly points out, the documents governing the benefits at issue in *UAW* were essentially identical to the documents governing the benefits at issue in the present case. As in the present case, the retiree health benefits were contained in successive collectively bargained agreements. In both cases, the GIAs were supplementary to the CBAs, and both sets of agreements contained general durational language that indicated that the agreements would remain/continue in effect until a date certain. In addition, the substantive provisions of the insurance agreements at issue in both cases were essentially identical. Although Judge Lifland did consider extrinsic evidence, he found, as a matter of law, that the CBAs and GIAs "were unambiguous and contained clear and unequivocal language to the effect that [they] would only be in effect until specific dates, and hence benefits provided thereunder were terminable by Curtiss–Wright after those dates." (*Id.*, p. 105). He rejected the plaintiffs' argument that the specific instances referred to in the GIAs in which benefits would terminate either when a retiree died or became eligible for Medicare were the only events that could terminate the benefits. He found that the specific events listed simply applied while the GIAs were in effect and that the general durational clause in the agreements also resulted in the termination of benefits (*Id.*, p. 110). Judge Lifland also rejected the argument that the absence of conversion rights for retirees suggests that retiree medical benefits were vested stating that

> [t]he reason why no conversion option was offered [to] retired employees was that the retirement health benefits could not cease during the term of each agreement, except for the death of the retired employee. Thus, during the term of the agreement, the retired employee needed no conversion option, but his/her spouse might.

(*Id.*, p. 142–43). The GIA at issue in *UAW* was amended in 1978 to provide a conversion right to retirees. He noted that this amendment gave retirees the additional protection of having a conversion right once their benefits were terminated, but also concluded that "[t]he lack of such protection for retired employees before 1978 does not prove that retirement health benefits were vested." (*Id.*, p. 144).

Plaintiffs argue that in reaching his decision, Judge Lifland relied on eight specific factors that are notably different from the proof brought in the present case (Item 144). Some deal with extrinsic evidence or oral representations and others with written agreements in the UAW plan. Although some of the factors differ, none of the differences are significant.

Plaintiffs attempt to distinguish the present case from *International Multifoods*, noting that in the latter case, the court relied heavily on specific language in the CBA that stated that during the "term of the agreement" there would be no reduction in benefits (Item 155, pp. 5–6). Plaintiffs assert that there is no such language in the insurance agreements at issue in the present case and that the absence of this language is significant.[1] In addition, plaintiffs note that in *International Multifoods*, the plaintiffs conceded that the employer could reduce or eliminate insurance after the CBAs expired (*Id.*, p. 6, footnote).

Plaintiffs also contend that there is language in the plan documents in the instant case that could reasonably be interpreted as promising health insurance for the retirees' entire retirement (Item 141, p. 6; Item 155, p. 3). Specifically, they argue that the insurance agreements, which contained general durational language, each had more specific language that health insurance "will be provided for employees receiving or becoming entitled to receive pension payments under the Curtiss–Wright Pension Plan by reason of normal, automatic, early or disability retirement provisions of such Plan." (Item 155, pp. 3–4, citing Joint Exhibit 2). Plaintiffs argue that this language, taken together with the fact that the insurance agreements listed the circumstances in which benefits would be limited or terminated without mentioning the general durational date of the CBA or insurance agreement, supports the inference that the parties intended for retiree health benefits to continue for the lifetime of retirees (Item 141, p. 7; Item 155 pp. 4–5). They say that the lack of conversion rights for retirees provides further support for this conclusion.

In addition, plaintiffs assert that the language in the SPD instructing retirees that " '[d]uring your retirement you and your covered dependent will have the same Basic Health Care coverage as you had while active at no cost to you,' " supports an inference of vesting, since there is no accompanying language limiting the scope of " '[d]uring your retirement.' " (Item 141, p. 8; Item 155, pp. 6–7).

After careful review of the foregoing arguments and the relevant documents, the court finds that the CBA and insurance plan documents fail to contain any written language that can be reasonably interpreted as creating a promise of vesting. The court finds both *International Multifoods* and *UAW* to be persuasive authority for the present case. In *International Multifoods*, the Second Circuit clearly found that the durational clauses in each of the agreements that created health insurance benefits, which provided that the agreements would "continue in effect" for a certain period, "necessarily establishes that once that time period expires, the promise does as well." *Id.*, 116 F.3d at 981. The more specific language in the GIAs, which provided that health insurance "will be provided for employees receiving or becoming entitled to receive pension payments ... by reason of normal, automatic, early or disability retirement provisions ...", (*see, e.g.,* Joint Exhibit 2, p. B–11) does not conflict with the general durational clauses. The court does not find that the inclusion of the phrase "during the term of the agreement" in the *International Multifoods* agreements distinguishes that case in any meaningful way.

Furthermore, the mere fact that the insurance agreements in the present case created rights for active employees and gave the dependents of retirees the right to convert their coverage to individual plans without the creation of a similar conversion right for retirees does not necessarily show that the parties intended for the coverage to continue throughout the retirees' lives. The fact that the retirees lacked a conversion right establishes no more than that retirees lacked a conversion right. The individuals who nego-

---

1. It is important to note that in both *International Multifoods* and the present case, the employ-ers terminated benefits only after the CBAs expired.

tiated the agreements were sophisticated in the bargaining process. There is no reason to believe that they were coerced or tricked into accepting this language. In addition, as defendant points out, this part of plaintiffs' argument relies primarily on the absence of language, and the absence of language does not satisfy the *International Multifoods* requirements.

The death of the retiree or the fact that a retiree qualifies for Medicare prior to the end of the governing CBA or insurance agreement is of no consequence. This clause merely addressed those circumstances that could lead to the termination of benefits prior to the end of the then-governing CBA and insurance agreement. Perhaps it would have been clearer if Curtiss–Wright had directly specified in these lists of termination events that the termination date of each CBA and GIA would also result in the termination of retiree health insurance benefits unless Curtiss–Wright and the United Steelworkers entered into a successive CBA and GIA. However, because each agreement contained an explicit durational clause, such a provision was not necessary.

The fact that the SPDs used the language "during your retirement" without including further language limiting the duration of benefits cannot be reasonably construed as creating a promise of vesting. If the mere description of retiree benefits as being provided during their retirement was sufficient, then, contrary to the general rule of *International Multifoods,* retiree benefits would always be vested. Furthermore, this argument simply reads out of the SPDs the express reservation of the right to terminate these benefits (*See e.g.,* Joint Exhibit 15, p. 58).

Finally, the summary annual reports that defendant sent to each participant of the company health plan, including retirees, starting in 1979 contained the express language that the termination of the CBA for any reason would result in the termination of the medical coverage (*See, e.g.,* Defendant's Exhibit 3). This provision, which was communicated to all class members, makes clear that the parties had not intended for retiree health benefits to be vested.

Having determined that the relevant documents do not contain any written language which could reasonably be interpreted to constitute a promise to vest retiree medical benefits, under *International Multifoods,* the court is precluded from considering any oral statements or other extrinsic evidence. Consequently, the court finds that the CBAs and GIAs executed by Curtiss–Wright and the United Steelworkers were unambiguous and contained clear and unequivocal language to the effect that the agreements would remain in effect until specific dates; therefore, any benefits provided were terminable by Curtiss–Wright after those dates. Thus, plaintiffs' motion for a permanent injunction prohibiting Curtiss–Wright from terminating or reducing retiree health insurance benefits for the lifetime of the members of the plaintiff class is denied.

## II. *Plaintiffs' Motion for an Order Entering Judgment on Plaintiffs' Claim that Defendant Breached Its Fiduciary Duty to Retirees When it Terminated Health Insurance Benefits*

▮ Plaintiffs contend that Curtiss–Wright, as both the plan sponsor and plan administrator of the health insurance plan, acted as a fiduciary when it decided to terminate retiree health benefits in 1987. (Item 125, pp. 10–11). They assert that defendant had no authority, as employer, to unilaterally amend or to terminate the retiree health insurance benefits since it had negotiated lifetime benefits. They argue that since the retiree health benefits were vested for the retirees' lifetime, defendant's action terminating those benefits when it locked out employees in May 1987 constituted a breach of its fiduciary obligation to the retirees as participants in the plan in violation of ERISA section 404 (*Id.,* p. 11).

This claim is denied because it is duplicative of plaintiffs' other claims. It appears that plaintiffs' claim for breach of fiduciary duty is premised on section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), which authorizes an injunction or "other appropriate relief" to remedy violations of the terms of an employee benefit plan or any provision of ERISA. A plaintiff may not pursue a claim

for breach of fiduciary duty based on section 502(a)(3) where that claim seeks relief that duplicates the relief sought on a claim for benefits under section 502(a)(1)(B). *Wald v. Southwestern Bell Corp. Customcare Medical Plan,* 83 F.3d 1002, 1006 (8th Cir.1996).

In their motion, plaintiffs state that they are seeking an order of judgment finding that defendant breached its fiduciary duty, without citing any section of ERISA (Item 124); but in their accompanying memorandum of law, plaintiffs say that they are seeking an order finding a breach of fiduciary duty under ERISA section 404, 29 U.S.C. § 1104 (Item 125, p. 2). However, section 404 does not by itself create a private cause of action. The statute suggests that plaintiffs' fiduciary duty claim could be premised either on section 502(a)(3),[2] 29 U.S.C. § 1132(a)(3), or on section 502(a)(1)(B),[3] 29 U.S.C. § 1132(a)(1)(B). Regardless of which section provides the underlying basis for plaintiffs' breach of fiduciary duty claim, the logic of defendant's argument remains persuasive. This claim is duplicative and must be dismissed.

Responding to concerns that permitting individual plaintiffs to bring breach of fiduciary duty claims in addition to other ERISA claims would simply allow plaintiffs to repackage claims for benefits, the Supreme Court in *Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) stated:

> We should expect that courts, in fashioning "appropriate" equitable relief, will keep in mind the "special nature and purpose of employee benefit plans," and will respect the "policy choices reflected in the inclusion of certain remedies and the exclusion of others." Thus, we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be "appropriate."

*Varity Corp.,* 516 U.S. at 514–15, 116 S.Ct. at 1079 (citations omitted).

### CONCLUSION

For the foregoing reasons, this court (1) denies plaintiffs' motion for judgment in their favor on their ERISA section 502 and LMRA section 301 claims, finding that the agreements executed by Curtiss–Wright and the United Steelworkers were unambiguous and contained clear and unequivocal language to the effect that the agreements would remain in effect until specific dates; therefore, any benefits provided thereunder were terminable by Curtiss–Wright after those dates; (2) denies plaintiffs' motion for a permanent injunction enjoining defendant from terminating or reducing retiree health benefits; and, (3) denies plaintiffs' motion for judgment in their favor on their ERISA section 404 breach of fiduciary duty claim as it is duplicative to the above claim.

The court will hold a telephone conference with counsel on January 14, 1998, at 4 p.m. to discuss any remaining issues.

So ordered.

---

**2.** Section 502(a)(3) authorizes a civil action by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

**3.** Section 503(a)(1)(B) authorizes a civil action by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."