**Charles A. JOYCE, Joseph C. Matesic, Richard A. Samer and Vernon P. Taylor, for themselves and all other persons similarly situated, Plaintiffs–Appellants,**

**v.**

**CURTISS–WRIGHT CORPORATION, Defendant–Appellee.**

**No. 1098, Docket 98–7723.**

United States Court of Appeals, Second Circuit.

Argued March 4, 1999.

Decided March 22, 1999.

David I. Goldman, Pittsburgh, PA (Joseph P. Stuligross, Pittsburgh, PA; E. Joseph Giroux, Jr., Buffalo, N.Y., on the brief) for Plaintiffs–Appellants.

Robert N. Eccles, Washington, D.C. (Karen M. Wahle, Gregory Y. Porter, O'Melveny & Myers LLP, on the brief) for Defendant–Appellee.

Before: JACOBS and SOTOMAYOR, Circuit Judges, and SAND, District Judge.*

* The Honorable Leonard B. Sand of the United States District Court for the Southern District of New York, sitting by designation.

SAND, District Judge:

Plaintiffs appeal from a final judgment of the United States District Court for the Western District of New York, John T. Curtin, Judge. The district court granted summary judgment pursuant to Federal Rule of Civil Procedure 56 and judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) in favor of defendant Curtiss-Wright Corporation ("Curtiss-Wright") and dismissed plaintiffs' claims, which were brought under Section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), codified at 29 U.S.C. § 1132, and Section 301 of the Labor Management Relations Act ("LMRA"), codified at 29 U.S.C. § 185.

The district court correctly applied the standard set forth in *American Federation of Grain Millers v. International Multifoods Corp.*, 116 F.3d 976 (2d Cir.1997) ("*Multifoods* "), and we affirm.

## Background

Plaintiffs are a class of retired former Curtiss-Wright employees (collectively "Joyce" or "retirees"), each of whom worked at the company's plant in Buffalo, New York. Curtiss-Wright entered into a series of collective bargaining agreements ("CBAs") with a Buffalo local of the United Steelworkers of America, AFL-CIO/CLC (the "Union"), beginning in 1965 and continuing in 1968, 1971, 1974, 1977, 1981, and 1984. Under the terms of these CBAs, retirees were eligible for health insurance benefits.

Each CBA provided that the terms of the health coverage were contained in a separate, concurrently entered into, Group Insurance Agreement ("GIA"). Both the CBAs and the GIAs contained express language stating that the terms and conditions "shall continue in effect until" a particular date. The 1984 GIA was to continue in effect "until midnight May 1, 1987."

Curtiss-Wright also prepared and distributed other documents in its capacity as administrator of the Curtiss-Wright Employee Benefit Plan. One such document was the Summary Plan Description ("SPD"), successive versions of which contained identical language: "Plan Continuation—The Company expects and intends to continue this Plan indefinitely but reserves the right to end or amend it. The benefits in this booklet are of a contractual nature, and they may be modified from time to time or terminated as a result of contractual negotiations."

In addition, beginning in 1979, Curtiss-Wright prepared and distributed Summary Annual Reports ("SARs"), successive versions of which contained the following statements: "The medical benefits plan under which you are now covered is provided to you under the terms of a Collective Bargaining Agreement. Accordingly, termination of the Collective Bargaining Agreement for any reason, shall result in termination of the medical coverage provided by such agreement."

On May 1, 1987, the existing CBA between Curtiss-Wright and the Union expired.[1] Curtiss-Wright terminated benefits to active employees and retirees as of that date. The parties were unable to complete a new agreement until July 27, 1987, at which point Curtiss-Wright reinstated benefits.

In August 1987, the Union filed a grievance protesting the termination of the retirees' health insurance during the period from May 1 to July 27. When Curtiss-Wright rejected that grievance, Joyce filed the present suit.

## Proceedings Below

By Decision and Order dated December 17, 1992, the district court denied the parties' cross-motions for summary judgment.

1. The parties disagree as to whether, on May 1, the company locked-out its employees or the Union began a strike. Resolution of this question would have no impact on our analysis and we therefore do not reach it.

The court correctly framed the question as being whether the retirees' health insurance benefits had vested. As of that time, however, the Second Circuit had not yet specified what language might be sufficient to support a claim of vesting in a collective bargaining agreement. The court therefore relied on a flexible standard and permitted the parties to submit extrinsic evidence as to their intentions under the agreements. Because that evidence demonstrated a genuine factual dispute as to whether the parties meant for retirement benefits to vest, the court denied both motions.

In April and May 1996, the court held a jury trial on the issue of liability. The jury concluded that the parties intended for the health benefits to vest and that Curtiss–Wright breached its contract with the Union.[2] In June 1996, Joyce moved for a preliminary injunction to enjoin Curtiss–Wright from any future termination of the retirees' benefits, and for other relief. The court heard oral argument on the motions in July 1997, one month after we issued our opinion in *Multifoods.*

In a Decision and Order dated December 30, 1997, *see Joyce v. Curtiss–Wright Corp.*, 992 F.Supp. 259 (W.D.N.Y.1997), the court concluded that under the framework established in *Multifoods,* and contrary to the court's December 1992 decision, the language contained in the CBA and the insurance plan (1) is unambiguous, and (2) does not operate to vest the retirees' benefits. *See id.* at 269. The court thereafter granted Curtiss–Wright's motions for reconsideration of the 1992 decision, judgment as a matter of law, and summary judgment, pursuant to Federal Rules of Civil Procedure 54(b), 50(b), and 56, respectively. The court entered a final judgment on April 22, 1998, and this timely appeal followed.

**Discussion**

Summary judgment is appropriate only if the moving papers and affidavits submitted by the parties show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. Pro. 56(c). In ruling on a motion for summary judgment, a court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). We review *de novo* a district court's grant of summary judgment. *See L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81, 87 (2d Cir.1998).

Neither party disputes that the health coverage offered by Curtiss–Wright to its retired employees is a welfare benefit plan for purposes of ERISA. *See* 29 U.S.C.A. § 1002(1), (3) (West 1999). Nor does either party dispute that "the general rule" under ERISA is "that an employee welfare benefit plan is not vested and that an employer has the right to terminate or unilaterally to amend the plan at any time." *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 77 (2d Cir.1996); *accord Multifoods,* 116 F.3d. at 979–80. The parties disagree, however, as to whether Curtiss–Wright promised, either intentionally or inadvertently, through language contained in the CBAs, GIAs, SPDs, SARs, or other plan documents, to vest the retiree's benefits. *See Schonholz,* 87 F.3d at 77 ("Nothing in ERISA ... forbids or prevents an employer from agreeing to vest employee welfare benefits or from waiving its ability to terminate or amend unilaterally a plan ...."); *see also Multifoods,* 116 F.3d at 980.

Our recent decision in *Multifoods* provides the appropriate framework for resolving this controversy. *Multifoods* in-

2. The district court entered judgment after receiving the jury's verdict but vacated this judgment a short time later after determining that the verdict did not dispose of all outstanding claims in the action.

volved a suit brought by retirees against their former employer, International Multifoods Corp., alleging violations of, *inter alia*, ERISA and the LMRA. International Multifoods had, for a number of years, paid the entirety of its retirees' medical insurance premiums. In 1992, the company announced that its retirees would be responsible for supplementing future premium payments to the extent that they increased faster than inflation. The retirees objected, claiming that the benefits had vested. As in this case, all CBAs had expired. *See Multifoods,* at 977–78. We held that the retirees' claim failed because they were unable to point to language that could reasonably be interpreted as constituting a promise to vest.

Even prior to *Multifoods,* "[a]ll courts agree[d] that if a document unambiguously indicates whether retiree medical benefits are vested, the unambiguous language should be enforced." *Id.* at 980 (citing cases). The courts of appeals disagreed, however, regarding the presumptions to employ when the documents are less clear. *See id.* (citing cases). We explained our resolution of that question as follows:

> In this Circuit, to reach a trier of fact, an employee does not have to "point to unambiguous language to support [a] claim. It is enough [to] point to written language *capable of reasonably being interpreted* as creating a promise on the part of [the employer] to vest [the recipient's] ... benefits." *Schonholz,* 87 F.3d at 78 (2d Cir.) (emphasis added and citation omitted)....

*Multifoods,* 116 F.3d at 980 (alterations in original).

We find no reason to depart from this recently-articulated standard. Accordingly, we must determine whether the retirees have identified specific written language that is reasonably susceptible to interpretation as a promise, by Curtiss-Wright, to vest the retirees' health benefits.

*Group Insurance Agreements*

Joyce cites nine purported sources of ambiguity, the first eight of which allegedly emanate from the text of the GIAs. The burden *Multifoods* imposes is ultimately one of identification: a single sentence can suffice to raise a question that requires resolution by a trier of fact. Referring to several statements that become ambiguous only after extensive linguistic contortion, however—here through fifteen pages of briefing and treatise citation—fails to satisfy this burden.

We are unpersuaded by Joyce's attempt to manufacture ambiguity by statements such as "[t]he GIAs state that insurance 'will be provided for employees receiving or becoming entitled to receive pension payments'" and "the 1965 GIA expressly provides for the 'termination' of retiree insurance upon a retiree's 'death or attaining the age at which he becomes or could become eligible for Medicare.'"[3] These statements cannot reasonably be read as binding Curtiss-Wright to vest the benefits at issue, and *Multifoods* does not ask us to go further.

Joyce also urges that we should infer vesting based on the *absence* of any right in the GIAs by which retirees could convert to individual insurance coverage if Curtiss-Wright were to terminate the plan's group coverage. Joyce maintains that because both active employees and retirees' spouses and dependents had conversion rights, the only reason that the retirees would themselves not receive these rights is because Curtiss-Wright could not terminate their group insurance coverage at all: *i.e.*, the retirees' benefits had vested.

We reject this argument for two reasons. First, Joyce overlooks reasonable

3. Joyce uses this latter statement as the hook for four of its eight textual arguments, and repeatedly attempts to obfuscate its plain meaning with reference to language that could have been added. This represents an unpersuasive circumvention of *Multifoods.*

explanations why Curtiss–Wright might not have given the retirees conversion rights. In particular, Curtiss–Wright employees could lose their status as "active employees" and would, absent a conversion right, lose all health coverage. Similarly, retirees' spouses and dependants would lose coverage upon the retiree's death absent provisions allowing them to convert to individual plans. There is, however, no analogous circumstance that would cause individuals designated as "retirees" to lose that status—absent death, which would obviate the need for healthcare, or resumption of active status, which would result in coverage under the "active employee" provisions. Therefore, Curtiss–Wright had little reason to provide the retirees with conversion rights.

Second, and as the district court recognized, Joyce's argument regarding conversion bespeaks a fundamental misunderstanding of *Multifoods,* in that the argument is simply not based on language that affirmatively operates to create the promise of vesting. *See Joyce v. Curtiss–Wright Corp.,* 992 F.Supp. 259, 269–70 (W.D.N.Y.1997) (applying *Multifoods* ). While context surely matters in the *Multifoods* analysis, at root the text itself must create a disputed question of fact as to vesting. *See, e.g., Sprague v. General Motors Corp.,* 133 F.3d 388, 400 (6th Cir.) (stating that a commitment to vest "is not to be inferred lightly" and that it must be found in express language from the plan documents), *cert. denied,* — U.S. —, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998); *Diehl v. Twin Disc, Inc.,* 102 F.3d 301, 306 (7th Cir.1996) (finding vesting based on language that retirees "shall ... be entitled for the lifetime of the pensioner" to receive life insurance, hospitalization, medical and surgical coverage and distinguishing cases where the relevant documents are devoid of plain language giving rise to an inference of vesting); *see also Bidlack v. Wheelabrator Corp.,* 993 F.2d 603, 605–08 (7th Cir.1993) (*en banc* ) (Opinion of Posner, *J.*) (stating that "there must be either contractual language on which to hang the label of ambiguous or some yawning void" and allowing case to go to jury in part based on written language distributed to each employee stating that "both you and your spouse will be covered for the remainder of your lives").

Joyce correctly notes that the CBA at issue in *Multifoods* itself contained language explicitly limiting the plan's duration. *See Multifoods,* 116 F.3d at 981 (quoting CBA, which provided that "[d]uring the term of this Agreement there shall be no reduction in the schedule of benefits"). Here, the benefit provision of the CBA does not itself contain a similar limitation. This distinction, however, fails to alter the result in this case. The absence of language in the 1984 GIA flatly *rejecting* the concept of vesting does not alter the retirees' failure to identify language that affirmatively operates to imply vesting.

The retirees' refrain, given the absence of vesting language, is that CBAs must be given a broad reading and that normal rules of contractual interpretation do not always apply in the labor relations context. We do not dispute the proposition that federal courts have recognized that for some purposes, labor litigation cannot be resolved appropriately by blind application of common law contract doctrines. Cognizance of this general principle, however, does not give us license to create obligations that neither ERISA, nor Curtiss–Wright's own statements, compel the company to provide. We will not infer a binding obligation to vest benefits absent some language that itself reasonably supports that interpretation.

*Summary Plan Descriptions*

Joyce also argues that Curtiss–Wright breached its obligations under ERISA by failing to honor promises contained in successive SPDs, documents that Curtiss–Wright promulgated unilaterally. Employers are bound by promises made in SPDs, which Congress intended to be a

primary source of information regarding plan benefits. *See* 29 U.S.C.A. § 1022 (West 1999); *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907 (2d Cir.1990). Thus, we look to the SPD to determine if it contained a promise of vesting broader than the representations made in the collectively bargained documents.

Joyce argues that the SPD is ambiguous as to whether Curtiss-Wright promised to vest benefits in light of the following statement: "During your retirement, you and your covered dependents will have the same Basic Health Care coverage as you had while active at no cost to you." We believe that the SPD and SAR contain other language that sufficiently vitiates any potential ambiguity.[4]

In particular, the SPD's reservation of rights clause explicitly mentions that the company "reserves the right to end or amend" the health insurance coverage it offered. The SAR informed the retirees that Curtiss-Wright "shall" terminate benefits if the CBA lapses "for any reason." Although we have not joined those circuits that have adopted the position that "a general amendment provision in a welfare benefits plan is of itself sufficient to unambiguously negate any inference that the employer intends for employee welfare benefits to vest contractually," *Spacek v. Maritime Ass'n*, 134 F.3d 283, 293 (5th Cir.1998) (citing cases in the Third, Fourth, Eighth, Tenth, and Eleventh Circuits), we believe that the SPD's reservation of rights clause, when combined with the termination language of the SAR, precludes any viable claim that the SPD served to vest the retirees' benefits. Curtiss-Wright's unilaterally-prepared documents fail to contain any promise broader than the statements we have already addressed in the GIA and are therefore insufficient under *Multifoods*.

**Conclusion**

For the foregoing reasons, we affirm the judgment of the district court.

4. In addition, we note that the language Joyce quotes from the SPD appears to do no more than place retired workers in the shoes of active employees. Curtiss-Wright was justified in terminating active employees' coverage when the 1984 CBA lapsed because the employees' coverage was conditioned on the existence of a valid CBA. Insofar as the SPD promised retirees "the same Basic Health Care coverage as you had while active," Curtiss-Wright was obligated to provide the retirees with no more than that which active employees had: namely, health coverage that would continue absent termination of a CBA with no replacement agreement.