William McMUNN, et al.

v.

**PIRELLI TIRE, LLC.**

No. 3:99CV1277(JBA).

United States District Court,
D. Connecticut.

July 19, 2001.

Alfred H. Sigman, Teresa S. Renaker, Todd F. Jackson, Sigman, Lewis & Feinberg, Oakland, CA, for plaintiffs.

Vaughan Finn, Shipman & Goodwin, Hartford, CT, Harold F. McGuire, Jr., Arthur V. Nealon, McGuire, Kehl & Nealon, New York City, for defendants.

### MEMORANDUM OF DECISION
[Docs. # 69, 76]

ARTERTON, District Judge.

## Table of Contents

I. Introduction .................................................................. 103

II. Factual background ........................................................ 104
 A. Retiree medical benefits ........................................... 105
 1. Pre–1985 Retirees............................................. 105
 2. Post–1985 Retirees ........................................... 107
 B. Medicare reimbursement ........................................... 108
 C. Prescription drug plan ............................................ 109

III. Discussion .................................................................. 110
 A. Summary judgment standard ....................................... 110
 B. Recovery of benefits due under the plans ......................... 111
 1. Medical insurance benefits (pre–1985 retirees) .............. 112
 a. The ERISA plan for pre–1985 retirees ................... 112
 b. The pre–1985 plan does not provide vested benefits ..... 114
 2. Medical insurance benefits (post–1985)....................... 115
 3. Medicare premium reimbursement ............................. 116
 4. Prescription drug coverage .................................. 119
 5. Summary .................................................... 119
 C. Breach of fiduciary duty .......................................... 120
 1. Material misrepresentations ................................. 120
 2. Representations by fiduciary ................................ 129
 3. Detrimental reliance........................................ 130
 D. Promissory estoppel .............................................. 130

IV. Conclusion .................................................................. 132

## I. Introduction

Plaintiffs, forty-eight Pirelli Armstrong Tire Corp. retirees and their spouses, have sued their former employer, Pirelli Tire LLC ("Pirelli") under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), seeking reinstatement of alleged "vested," or non-forfeitable, retiree medical benefits that were reduced or eliminated by Pirelli on April 1, 1993 and payment of their out-of-pocket expenses for benefits withheld since 1993.[1] Alternatively, plaintiffs claim that if they are not entitled to these benefits under the terms of their retiree benefits plan, Pirelli breached its fiduciary duty to provide them with truthful, accurate information about the plan, in violation of ERISA, 29 U.S.C. § 1132(a)(3). Plaintiffs further claim that defendant is estopped

from denying benefits based on its past representations to plaintiffs and their reliance on those promises.

Plaintiffs Dominic Annatone, James McElhannon, William McMunn, Alexander Monko, Jr., John Taylor, Melton Walker and Billy Young have moved for summary judgment on liability [Doc. # 76]. Defendant Pirelli has cross-moved for summary judgment [Doc. # 69], asserting that the retiree medical benefits were not vested, there was no violation of fiduciary duty under ERISA, and promissory estoppel does not apply.

Although an employee's medical benefits plan ordinarily can be changed during the course of retirement, a promise of non-forfeitable or vested benefits made

---

**1.** Pirelli purchased Armstrong Tire Corp. in 1989, after which Armstrong became known as Pirelli Armstrong Tire Corp. For purposes of this ruling, reference to "Armstrong" or "Pirelli" depends on the time period at issue.

through use of language guaranteeing that medical benefits will be provided unchanged by the company for the lifetime of a retiree is enforceable. Because a benefits plan cannot be amended through informal communications, and amendments to the plan will be considered binding only where made at the same level of formality as the plan itself, usually such a promise of vested benefits must be contained within the plan itself. However, the obligations imposed by the fiduciary relationship between the employer and the beneficiaries prohibits the employer from making material misrepresentations to beneficiaries about the terms of their benefits plan. Therefore, while informal communications cannot alter the terms of a formal ERISA plan, where a person acting in a fiduciary capacity conveys misleading or inaccurate material information to the plan beneficiaries, that conduct may give rise to liability under ERISA.

This case involves the intersection of these two fundamental principles of ERISA law. It is undisputed here that plaintiffs were consistently told by Armstrong over a period of thirty years that they would have medical benefits from "womb to tomb," and that their benefits would be the same in retirement as during employment. Moreover, the undisputed evidence presented to the Court clearly shows that when these promises were made, Armstrong and later Pirelli had every intention of continuing to offer retiree medical benefits consistent with past practice until 1993, when, faced with rising costs of medical insurance and increasing economic problems, Pirelli conditioned continuation of retiree medical insurance on retiree contribution to premiums and increased deductibles, and eliminated the prescription drug plan and the subsidy for Medicare Part B premiums.

The first issue presented by these cross-motions is whether Armstrong legally obligated itself to providing these benefits for the duration of the retirees' and their spouses' lifetimes, or whether it retained discretion to change or terminate the benefits plans. Answering this question requires the Court to determine which documents constitute the relevant benefit plans, and whether the benefit plans contain language promising lifetime, non-forfeitable benefits. Plaintiffs' breach of fiduciary duty and estoppel claims, in turn, require analysis of the promises or representations made by Armstrong or Pirelli to the plaintiff retirees, and whether these plaintiffs reasonably relied on those promises to their detriment.

## II. Factual Background

The following undisputed factual description of the documents describing the benefits applicable to the plaintiffs is taken from Plaintiffs' Statement of Undisputed Facts, Plaintiff's Local Rule 9(c)(2) Response to Defendant's Statement of Undisputed Facts, Defendant's Statement of Undisputed Facts, the Declaration of Sherwood Willard, and Defendant's Local Rule 9(c)(2) Response to Plaintiffs' Statement of Undisputed Facts.[2]

---

**2.** Plaintiffs object to defendant's reliance on Sherwood Willard's declaration as basis for its statement of undisputed facts of events that occurred prior to December 1991, the date Willard became employed by Pirelli. However, Willard's declaration is based on his knowledge of Pirelli documents relating to employee benefits, and such documents are within his direct control and can be authenticated as genuine business records, under F.R.E. 803(6). The statement of undisputed facts therefore is adequately supported to meet the requirements of Fed.R.Civ.P. 56 and the Court considers it as part of the record for ruling on the pending cross-motions.

Plaintiffs and defendant agree that the governing medical benefits plan for each plaintiff is the plan that was in effect as of the date of retirement. Plaintiffs accordingly can be categorized into two classes: those who retired prior to January 1, 1985, who were not required to make any copayment or deductible payment toward their medical insurance, and those who retired after defendant instituted the $100 single/$200 family deductible effective January 1, 1985.

### A. Retiree medical benefits

#### 1. Pre–1985 Retirees

Plaintiff Dominic Annatone retired in 1981, James McElhannon and Billy Young retired in 1983, and Melton Walker retired in 1984. Upon retirement these four plaintiffs received medical insurance benefits with no deductible or retiree contribution until the changes in 1993.

Prior to early 1981, employees were covered under two Connecticut General ("CG") insurance policies which provided certain medical benefits to employees, including major medical coverage. The CG policies defined "employee" to "include a retired Employee who was insured under the policy on the day prior to his retirement." [3] In the section titled "Termination of Insurance," those policies also provided that "[i]f an Employee's Active Service terminates because of retirement, the insurance, other than Maternity Expense Benefits and Obstetrical Expense Benefits, will be continued, during the period the Employee remains retired, until the Policyholder ceases to pay premiums for the Employee or otherwise cancels the insurance." [4] A separate section titled "Discontinuation of the Policy," provides in part that "the Policyholder may discontinue this policy as of any Premium Due Date by giving the Insurance company written notice in advance of that date." [5]

Summary Plan Descriptions ("SPDs") describing the terms of these CG policies were prepared by CG in 1976, following the enactment of ERISA. The first SPD, effective October 1, 1976, states that "if you retire, your Life Insurance and your Medical Care benefits will be continued until the employer stops payment of premiums for you.... The insurance for a family member terminates when your insurance terminates, or when the family member is no longer eligible, whichever happens first." [6] The second SPD, effective January 1, 1981, contains virtually identical language. The insurance certificate issued by CG describing these policies included retired employees within the definition of "employee" and provided that medical insurance "will be continued until the date on which the Policyholder ceases to pay premiums for the employee or otherwise cancels the insurance." [7]

In February 1981, Armstrong converted to a self-insured arrangement under which CG administered the plan and made benefit payments from a revolving Armstrong bank account. [8] The policy in effect at this time continued to define "employees" to include "retired employees who were insured under the policy on the day prior to his retirement." [9] Thus, in retirement, plaintiffs Annatone, McElhannon, Young and Walker were covered under the terms

---

3. Willard Dec., Exs. C, H.

4. *Id.*

5. *Id.* at PT002600.

6. Willard Dec. Ex. D, at PT00073.

7. Willard Dec. Ex. G, at 423, 453.

8. *See* Pl.'s Ex. 34 at 110006–13.

9. *Id.* at 110003.

of the CG policy governing the self-insured plan. None of the CG policies or the SPDs expressly stated that medical benefits were non-forfeitable or would continue for the lifetime of the retired salaried employees. On the other hand, neither the policies or the SPDs issued during the relevant time period contained an express statement that Armstrong reserved the right to modify or terminate the plan benefits at any time.

In addition to the CG policies, SPDs and the insurance certificates, Armstrong prepared Personnel Policy Directives ("PPDs") to be used by personnel managers as a reference when advising employees about their benefits.[10] The 1976 PPD was sent by the Vice President of Personnel and Employee Relations, G.R. Millar, to officers, directors and plant managers with an attached note stating that "Employee Relations at all locations is responsible for communicating these changes to all covered employees."[11] The PPDs were kept at the personnel office at each plant, and employees were permitted to take the books home to familiarize themselves with the terms of the plan.

> The PPD issued in 1976 provides that: Employees who are retired by the Company ... shall continue to receive the benefit described in this Policy.... The surviving spouse of an Employee who is retired by the Company on or after the effective date of this Personnel Policy Directive, provides such spouse, as of the date of death of such retired former

Employee was covered for these benefits as an eligible dependent, shall continue to be eligible to receive such benefits to the earlier of the date of death or remarriage.[12]

There is no language in the 1976 PPD reserving the right to Armstrong to change or terminate benefits, except "[t]he Plan as described above may be appropriately modified where necessitated by federal or state statute or regulation."[13]

The 1976 PPD was in effect until 1984, when Armstrong changed its benefits plan.[14] However, additional PPDs governing retirees were promulgated during that time period. In 1980, a PPD for terminated salaried employees was issued.[15] This PPD states that the following benefits would be provided to retirees following normal or early retirement: hospital, medical and surgical coverage; major medical plan; prescription drug plan; and life insurance coverage.[16] If a pension-eligible employee died, his or her surviving spouse was provided with benefits "so long as they remain qualified as such."[17] The 1980 PPD contained no language indicating the duration of benefits. As with the 1976 PPD, there also was no reservation of Armstrong's right to change or terminate benefits.[18] Finally, in 1982, Armstrong issued a PPD that modified the 1980 PPD to include payments for Medicare Part B as an additional benefit to retirees.[19] The 1982 PPD, like the 1980 PPD, made no mention of duration and had no reservation of rights.

10. *See* Pl.'s Statement of Undisputed Facts, at ¶¶ 325, 326.

11. Pl.'s Ex. 4.

12. Willard Dec. Ex. E, at 12.

13. *See id.*

14. *See* Def.'s 9(c)(2) Statement, at ¶ 335.

15. *See* Pl.'s Ex. 28.

16. *Id.*

17. *Id.*

18. *See id.*

19. *See* Pl.'s Ex. 29.

Although the benefits package for active salaried employees changed in 1984, effective January 1, 1985 for those employees who retired between January 1, 1984 and December 31, 1984, benefits for those salaried employees who had retired prior to January 1, 1984 were not changed, apart from two minor modifications to the prescription drug plan.[20] Accordingly, salaried retirees who had retired prior to January 1, 1984 were covered under the pre–1985 Plan described above and did not receive information regarding the post–1984 changes for active employees.[21]

A certificate of insurance issued in 1988 applicable to those salaried employees who had retired before January 2, 1985 expressly provided that "[t]he Plan Administrator may change or terminate benefits under the plan and may terminate the whole plan or part of it."[22]

### 2. Post–1985 Retirees

In January 1984, effective January 1, 1985 for employees who retired within this one year window, Armstrong began requiring payment of a deductible and co-payment for medical insurance under a new insurance plan called the "Family Health Program."[23] Plaintiffs John Taylor, Alexander Monko and William McMunn received benefits under this plan and retired during this time period.

A document entitled "New Directions in Benefits II for Salaried Employees Retro-active June 21, 1984" ("New Directions II") was distributed to salaried employees in June 1984.[24] The New Directions II document described the new benefits package, and informed employees that "[i]t is management's intent to continue these Plans indefinitely, but Armstrong reserves the right to change, modify or discontinue any of the Plans at any time, giving due notice to Plan participants."[25] The New Directions II document, unlike the earlier SPDs and CG policies, did not define "employee" to include retirees who were previously covered under the policy. However, the "Termination of benefits" section of the CG insurance certificate in effect as of January 1, 1984 states that "[i]f your Active Service ends because you retire: … your Medical Insurance may be continued until your Employer stops paying premiums for you. See your Benefit Plan Administrator for details."[26]

Effective May 31, 1988, a new CG policy was issued after Pirelli's corporate predecessor bought Armstrong's stock in 1989.[27] Under this policy, Pirelli continued to require payment of deductibles and co-payments, and CG continued to administer the plan.[28] The 1989 Salaried Employee Benefits Handbook issued by Pirelli describing, inter alia, the medical benefits plan, provided that "Pirelli Armstrong Tire Corporation reserves the right, at its sole discretion, to modify or terminate the plans or

---

20. *See* Pl.'s Statement of Undisputed Facts, at ¶¶ 317, 397.

21. *See* Pl.'s Statement of Undisputed Facts, at ¶ 390.

22. Willard Dec. Ex. R, at 76.

23. Apparently, the CG policy in effect on January 1, 1985 is missing from defendant's files, although defendant has submitted a CG insurance certificate describing the details of the post–1984 program. *See* Willard Dec. Ex. N.

24. It is undisputed that this document failed to comply with all the ERISA reporting requirements to qualify as an SPD.

25. Willard Dec. Ex. M, at 30.

26. Pl.'s Ex. 39 at 160018.

27. *See* Willard Dec. ¶ 18.

28. *See* Willard Dec. Ex. Q.

policies at any time." [29] In the Table of Contents, the Handbook lists a section entitled "Termination of Benefits" and notes that it was "to be issued at a later date." [30] However, no such section was ever issued.[31]

While the deductible amount increased over time from January 1, 1984 for active employees, salaried employees who retired between January 1, 1985 and January 1, 1991 were required to pay the lowest level deductible and co-payment toward the cost of their medical benefits during retirement. Plaintiff Taylor retired in 1985, and his deductible remained at the lowest level until the changes in 1993 giving rise to this lawsuit.

In July 1990, facing financial problems, Pirelli determined that it had to reduce its salaried workforce by approximately 10 percent.[32] To achieve that goal voluntarily, Pirelli offered an Optional Pension/Severance Program ("OPS"). Two of the moving plaintiffs, McMunn and Monko, retired under the OPS program in 1990. The OPS provided severance pay for participants eligible for unreduced pensions or early retirement, and credited additional age and years of service to allow other participants to qualify for unreduced pensions.[33] The OPS plan stated that OPS retirees would receive "the normal medical, prescription drug, and life insurance benefits available to retirees." [34] As noted, prior to 1991, retiree medical benefits were provided at the lowest deductible payment level, and included prescription drug coverage with a one dollar co-payment. For those OPS retirees whose retirement was deferred until 1991, the OPS plan provided that "the single/family deductible under the medical plan will be $100/$200 during the individual's retirement." [35]

In a script prepared by Harold Hoppert, the Vice President of Human Relations, for use in presenting the OPS program to human resources personnel, he emphasized that one of the benefits of retiring under the OPS plan was to provided "added security":

> As an example, there are those who have expressed concern about the revisions to the retiree medical plan deductible effective January 2, 1991. Our plan affords many of you the opportunity to act now to obtain a $100/$200 deductible during retirement *and not be affected by the upcoming changes in retirement insurance.*[36]

Thus, when plaintiffs Monko and McMunn retired in 1990, they were required to pay only a $100 single/$200 family deductible to receive their medical coverage.

B. *Medicare reimbursement*

Starting in January 1, 1980, Armstrong began a program by which salaried retirees were reimbursed by Armstrong for the cost of Medicare Part B premiums which the retirees paid directly to the government.[37] No SPD or written policy was issued for the retiree Medicare reimbursement program. All moving plaintiffs were

29. Willard Dec. Ex. S, at A–2.

30. *Id.*

31. See Willard Dec. ¶ 28.

32. *See* Pl.'s Ex. 102.

33. *Id.*

34. *Id.*

35. *Id.* Salaried employees who retired after January 2, 1991, not as part of the OPS plan, were required to pay a higher deductible based on their most recent salary. *See* Pl.'s Statement of Undisputed Facts, ¶ 318. This change was applied prospectively only. *Id.*

36. Pl.'s Ex. 48 at 250003 (emphasis added).

37. *See* Willard Dec. Ex. I.

covered by this program prior to the changes in benefits in 1993.

These Medicare reimbursement payments were made from general corporate funds. No exercise of discretion as to eligibility or amount was required, and payments were made if the retiree was at least 65 years old.[38] The letter sent to retirees describing this program stated that "[i]n order to receive this benefit, it is only necessary that you complete and return the attached form to the Corporate Insurance Department along with a copy of your Medicare Part 'B' card(s)."[39] The application forms sent by Armstrong dated February 1983 unambiguously state that "[p]ayment of this benefit will continue during the pensioner's lifetime. In the event of the pensioner's death, the spouse will continue to receive benefit [sic] until his or her death or remarriage."[40] Similarly, the application forms sent out by Pirelli Armstrong, revised November 1989, clearly state that "[t]his benefit is payable for the lifetime of the retiree and/or spouse."[41]

The 1984 Insurance Certificate describing the salaried employees' group insurance states that "If you remain in active service beyond age 65, you may elect to be covered for Comprehensive Medical Benefits on the same basis as any other employee. You may elect to continue medical coverage under one of two options.... 2. You may elect not to be covered for Comprehensive Medical Benefits. Your medical benefits would be covered only from Medicare. *The Armstrong Rubber Company will reimburse you for the cost of your Medicare Part B coverage.*"[42] Further, a Personnel Policy Directive ("PPD") effective August 1, 1982 applicable to salaried employees lists Medicare Part B premiums as one of the company-paid benefits provided to employees who leave the company through normal or early retirement.[43]

## C. Prescription drug plan

From 1976 through 1992, Armstrong, and then Pirelli, provided prescription drug coverage to both salaried employees and retirees, administering the coverage contractually through insurance companies.[44] The only plan changes from 1976 through 1993 were in the deductible amount, which originally was $1.00 deductible for each prescription. The deductible was raised to $3.00 after January 1, 1985, and effective January 1, 1986, was reduced back to $1.00.[45] These changes applied to active and retired employees. All moving plaintiffs were covered by this prescription drug plan during their retirement.........

In 1977, effective October 1, 1976, a SPD describing this plan was filed with the Department of Labor in compliance with ERISA. The 1977 SPD provided that "[i]f you qualify for such benefits under the Retirement Plan, your Prescription Drug coverage will be continued after you retire, in accordance with the Plan. It may be possible, too, for the benefit coverage to continue on behalf of your surviving spouse and eligible dependents after your death following retirement. Complete details are available from the Employment

---

**38.** *See* Willard Dec. at ¶ 35.

**39.** Pl.'s Ex. 50.

**40.** Pl.'s Ex. 51.

**41.** Pl.'s Ex. 52.

**42.** Willard Dec. Ex. N, at PT002882 (emphasis added).

**43.** *See* Willard Dec. Ex. K, at PT001231.

**44.** *See* Willard Dec. ¶ 25.

**45.** *See* Willard Dec. Exs. L, O, P.

Benefits Administrator in your local Personnel/Industrial Relations office."[46] The 1977 SPD contained no durational language stating that coverage would continue until the death of the retiree or for the duration of his/her retirement. In identifying the company's responsibilities under the plan, the 1977 SPD expressly stated: "3. The Company may amend the Plan if necessary. 4. The Company may terminate the Plan; however, the Company intends to continue the Plan."[47]

Prescription drug coverage was also identified in the 1976 PPD as a salaried retiree benefit, and both the 1984 New Directions II brochure and the 1989 Employee Benefits Handbook contain references to the prescription drug plan. As noted previously, both these documents also contained express reservations of defendant's rights to amend or terminate the plans.

## III. Discussion

### A. *Summary judgment standard*

A court shall grant a motion for summary judgment under Fed.R.Civ.P. 56 "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[48] The moving party bears the initial burden of establishing that no genuine issue of material fact exists and that the undisputed facts show that she is entitled to judgment as a matter of law.[49] In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.[50]

Once this initial burden has been met, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "[51] A party seeking to defeat a summary judgment motion cannot "rely on mere speculation or conjecture as to the true nature of facts to overcome the motion."[52] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."[53]

On cross-motions for summary judgment "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other."[54] "Rather, the court must evalu-

---

46. Willard Dec. Ex. F, at PT000012.

47. *Id.* at PT00013.

48. *Silver v. City Univ.*, 947 F.2d 1021, 1022 (2d Cir.1991).

49. *See Rodriguez v. City of New York*, 72 F.3d 1051, 1060 (2d Cir.1995).

50. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir.2000).

51. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

52. *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995) (*quoting Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)).

53. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

54. *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993) (citing *Schwabenbauer v. Board of Educ. of Olean*, 667 F.2d 305, 313 (2d Cir.1981)).

ate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." [55]

## B. *Recovery of Benefits Due under the Plans*

Plaintiffs argue that by changing the medical benefits provided to salaried retirees in 1993, defendant violated ERISA, 29 U.S.C. § 1132, by improperly withholding benefits due to them under the plans described above, and that they are entitled to summary judgment on this count because the plans unambiguously created a legally vested interest in these medical benefits. Defendant counters that it is entitled to summary judgment on this claim because, as a matter of law, the plans do not create any vested rights.

Under ERISA, employee welfare plans, unlike pension plans, are not required to vest, and absent any vesting term in the plans themselves, the employer may unilaterally amend or terminate a welfare plan at any time.[56] By not statutorily requiring vesting of medical benefits, Congress has provided employers with flexibility to respond to unpredictable medical insurance needs and costs.[57]

On the other hand, if the employer promises to provide vested medical benefits, such a promise will be enforced un- der ERISA as a plan term.[58] Where a plan document "unambiguously indicates whether retiree medical benefits are vested, the unambiguous language should be enforced." [59] The Second Circuit has held that "to reach a trier of fact, an employee does not have to point to unambiguous language to support [a] claim. It is enough [to] point to written language capable of reasonably being interpreted as creating a promise on the part of [the employer] to vest [the recipient's] ... benefits." [60]

In assessing whether an ERISA plan contains a vesting term, this Circuit has emphasized that extrinsic evidence such as "informal communications between an employer and plan beneficiaries" cannot amend an ERISA plan, "absent a showing tantamount to proof of fraud." [61] This rule gives effect to ERISA's requirement that plans and SPDs be the primary means of informing beneficiaries and participants of their and their employer's rights and obligations under the plans.[62] However, where an ERISA plan is not promulgated by means of formal documents, amendments will be considered binding where made at the same level of formality as the plan itself, and informal plans are enforceable under ERISA if they meet certain criteria.[63] Thus, employers cannot strategically avoid ERISA's substantive requirements by failing to comply with its proce-

---

55. *Schwabenbauer*, 667 F.2d at 314.

56. *See American Federation of Grain Millers, AFL–CIO v. International Multifoods Corp.*, 116 F.3d 976, 978 (2d Cir.1997).

57. *See id.* (*citing Moore v. Metropolitan Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir.1988)).

58. *See Schonholz v. Long Island Jewish Medical Center*, 87 F.3d 72, 77 (2d Cir.1996) ("nothing in ERISA prevent[s] an employer from contracting to vest employee welfare benefits").

59. *Multifoods*, 116 F.3d at 980.

60. *Id.* (alterations in original) (*quoting Schonholz*, 87 F.3d at 78).

61. *Moore*, 856 F.2d at 492.

62. *See id.*

63. *See Schonholz*, 87 F.3d at 78.

dural requirements.[64]

The two questions that must be answered then to determine whether any of the moving plaintiffs can demonstrate vested rights in their retiree medical benefits are: what constitutes the relevant ERISA plan applicable to each plaintiff, and whether the terms of that plan provide for vested benefits.

1. *Medical insurance benefits (pre–1985 retirees)*

a. *The ERISA Plan for pre–1985 retirees*

Defendant claims that the Plan in effect for pre–1985 retirees, applicable to plaintiffs Annatone, McElhannon, Walker and Young, consists solely of the CG policies and the relevant SPDs and insurance certificates. According to the defendant, this case falls squarely within the Second Circuit's holdings in *Moore, Multifoods,* and *Joyce,* and plaintiffs' evidence of informal communications such as the PPDs and oral promises by human resources employees cannot be used to create a binding promise to vest medical benefits where none appears in the plan documents themselves. Relying on *Moore,* defendant argues that the PPDs cannot be relied on as part of the ERISA plan documents, as they were simply summaries of then-current benefits, rather than part of the formal plan. Plaintiffs, in contrast, claim that the Plan was an informal one comprised of the totality of the CG policies, the SPDs, the certificates, the PPDs and defendant's past practice and representations, whose collective provisions demonstrate that medical benefits vested at retirement.

In *Moore,* the company had provided information about its benefits to employees through summary plan descriptions, as well as filmstrips, materials given to managers to be used in conjuncture with the filmstrips, articles in company newsletters and letters and memos to active employees and retirees.[65] The SPDs and the plan insurance policy contained a reservation of rights; other informal communications including the newsletters and filmstrips did not, and "occasionally described these benefits as being for the employee's 'lifetime,' and 'at no cost.'"[66]

The plaintiffs in *Moore* had argued that, despite the existence of SPDs containing an express reservation of the company's right to amend or terminate the plan, the contract between the company and the retirees consisted of the totality of the representations and communications made by the company.[67] The Second Circuit rejected that argument on the grounds that it "would undermine ERISA's framework which ensures that plans be governed by written documents filed under ERISA's reporting requirements and that SPDs, drafted in understandable language, be the primary means of informing participants and beneficiaries."[68] The court also observed that the filmstrips and letters containing statements suggesting vesting

---

**64.** *See Donovan v. Dillingham,* 688 F.2d 1367, 1372 (11th Cir.1982) ("because the policy of ERISA is to safeguard the well-being and security of working men and women and to apprise them of their rights and obligations under any employee benefit plan, *see* ERISA § 2, 29 U.S.C. § 1001, it would be incongruous for persons establishing or maintaining informal or unwritten employee benefit plans, or assuming the responsibility of safeguarding plan assets, to circumvent the Act merely because an administrator or other fiduciary failed to satisfy reporting or fiduciary standards").

**65.** 856 F.2d at 490.

**66.** *Id.*

**67.** *Id.* at 491.

**68.** *Id.* at 492.

of benefits "did not purport to be complete binding statements of plan terms. While the use of language such as 'lifetime' or 'at no cost' might conceivably create a triable issue of fact on a contract theory, it does not constitute the type of misleading behavior that would cause us to override plan documents and SPDs created pursuant to ERISA." [69]

Plaintiffs here make no allegation of fraud or bad faith triggering the *Moore* exception. Instead, plaintiffs argue that *Moore* is inapplicable because they are not seeking to amend a plan with extrinsic evidence, but that the PPDs, to which Employee Relations officers were instructed to turn for assistance in answering employee questions about their benefits, combined with the CG policies and the SPDs in effect for various years, themselves constitute the relevant plan documents.

█ Although plaintiffs argue at length that no formal plan documents set forth the terms of what they characterize as the "Retiree Medical Plan" for pre–1985 retirees, the CG policies and certificates in effect from 1976 through 1984 define "employee" as including retirees who had been covered under that policy while in active employment. Therefore, the absence of any separate retiree medical plan is of no significance, as plaintiffs who retired in this time period are entitled to the benefits identified by the terms of the Plan in effect at the time of their retirement. At oral argument, plaintiffs conceded as much.[70]

█ The Court next considers plaintiffs' position that the 1976 PPD must be considered part of the plan because crucial terms are missing from the formal documents. Plaintiffs identify three allegedly missing terms: the absence of durational language in the SPDs and CG policies, and the inclusion in the 1976 PPD of a description of the terms of the prescription drug and HMO coverage plans. In this Circuit, however, the absence of a durational term in the formal Plan documents does not permit the Court to consider other documents to supply this term, but instead requires the conclusion that the Plan documents themselves lack affirmative vesting language.[71] Next, in light of the existence of a separate policy and SPD covering prescription drug coverage, *see infra*, the absence of a discussion of the terms of the prescription drug plan in the CG policies and SPDs does not require the Court to look to the 1976 PPD to determine the terms of that plan. Finally, the reference to HMO coverage in the 1976 PPD describes defendant's policy and future intent, but does not set forth any terms of HMO plan coverage, as plaintiffs contend: "The Company will make arrangements to afford individual Employees the option to subscribe to Health Maintenance Organization [sic] when they become available in their area, if such plans are approved by the Company, in lieu of all coverage provided in this section, subject to the limitation on Company contributions contained in Subparagraph (b) below." [72] Plaintiffs have thus failed to demonstrate that the CG policies and SPDs were in-

**69.** *Id.*

**70.** Plaintiffs also agreed that because their benefits allegedly vested at retirement under the terms of the policy in effect at that date, they would not be entitled to any improvements made by Pirelli to their benefits since the date of their retirement.

**71.** *See Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130, 135 (2d Cir.1999) (holding that absence of language explicitly limiting the plan's duration "does not alter the retirees' failure to identify language that affirmatively operates to imply vesting").

**72.** Willard Dec. Ex. E at 14.

complete in any way that would require the Court to look to the 1976 PPD to determine the terms of the medical insurance benefits plan applicable to pre–1985 retirees.

 Plaintiffs also claim that because they were informed by various Armstrong personnel managers that their benefits were to be provided in accord with terms of the PPDs and the PPDs were prepared by defendant for use as a resource for advising employees of their rights, they are properly to be considered part of the ERISA Plan.[73] These communications served a purpose strikingly similar to that of the filmstrips and newsletters described in *Moore*. Permitting such informal communications to amend the terms of the formal ERISA plan, as plaintiffs' urge the Court to do, would contradict *Moore*'s prohibition on informal amendment, and undermine ERISA's framework:

> Were all communications between an employer or Plan beneficiaries to be con-

sidered along with the SPDs as establishing the terms of a welfare plan, the plan documents and the SPDs would establish merely a floor for an employer's future obligations. Predictability as to the extent of future obligations would be lost, and, consequently, substantial disincentives for even offering such plans would be created.[74]

For the foregoing reasons, the Court concludes that the medical benefits Plan applicable to those plaintiffs who retired between 1976 and 1984—Annatone, McElhannon, Young and Walker—consists only of the SPDs and CG policies.[75] Having identified the applicable Plan, the next question is whether that Plan provides vested benefits.

### b. The pre–1985 Plan does not provide vested benefits

While plaintiffs and defendant dispute whether the pre–1984 Policies or SPDs contained a reservation of rights,[76] they

---

**73.** *See, e.g.,* Pl.'s Statement of Undisputed Facts, at ¶¶ 345–47; Pl.'s Exs. 31, 32 (letters from Harold Hoppert, Manager of Industrial Relations, to Robert Parker and Robert Hickey (non-moving plaintiffs), noting that retirement benefits will be provided "in accordance with the appropriate Personnel Policies").

**74.** *Moore,* 856 F.2d at 492.

**75.** While the representations in the 1976 PPDs are not considered part of the ERISA Plan, they are, as discussed *infra,* relevant to determining whether defendant breached its fiduciary duty by providing affirmatively misleading or inaccurate information.

**76.** Defendant maintains that the CG policies and the SPDs, which provided, respectively, that retiree benefits would continue "until the Policyholder ceases to pay premiums for the Employee or otherwise cancels the insurance" and that "if you retire ... benefits will be continued until the employer stops payment of premiums for you," as well as the identical provision in the insurance certificate stating that insurance "will be continued until

the date on which the Policyholder ceases to pay premiums for the employee or otherwise cancels the insurance," constituted a reservation of its rights to amend or cancel the Plan at any time. Plaintiffs construe the cited provisions of the CG policies as simply governing the obligations owed by CG, and not operative to reserve the company's rights vis-a-vis its employees. Defendant also relies on the 1989 SPD describing the pre–1985 retiree benefits, which does contain an express reservation of rights to modify or terminate the plan. However, as plaintiffs correctly note, if their rights vested upon retirement prior to 1985, the belated reservation of rights in 1989 could not retroactively alter those vested rights. While plaintiffs' view of the effect of the language contained in the CG policies and SPDs may be the more persuasive, absent any demonstration that the Plan covering medical benefits for pre–1985 retirees contains language creating any ambiguity with respect to whether these benefits vested, the absence of a rights reservation *vel non* is immaterial in deciding these cross-motions for summary judgment.

agree that the CG policies and SPDs contain no terms providing for vesting of lifetime medical benefits.[77] Plaintiffs argue, citing a Ninth Circuit case, *Bower v. Bunker Hill Co.*,[78] that "where the plan does *not* speak to vesting, extrinsic evidence *must* be considered to determine whether benefits are vested."[79]

 This application of *Bower*, however, contradicts this Circuit's subsequent interpretation of ERISA, under which an employer is not required to prove that its benefits plan contains language demonstrating an unambiguous intent *not* to vest; instead, plaintiffs must point to language in the Plan capable of being reasonably interpreted as a promise to vest benefits.[80] The *Joyce* court emphasized that "[w]hile context surely matters ..., at root the text itself must create a disputed question of fact as to vesting."[81] Moreover, *Joyce* expressly considered and rejected the claim made here that in the absence of an explicit reservation of rights or other language explicitly limiting the plan's duration, the lack of durational language in a plan permits the court to look outside the plan documents: "[w]e will not infer a binding obligation to vest benefits absent some language that itself reasonably supports that interpretation."[82]

In the absence of any language that could reasonably be interpreted as a promise of vested lifetime medical insurance benefits, defendant was not barred by the terms of the Plan from modifying or terminating retiree medical benefits for the pre–1985 retirees.

### 2. Medical insurance benefits (post–1985)

 Unlike the CG policies and SPDs in effect prior to 1984, the New Directions II document prepared in 1984 describing the changes in benefits under the new CG policy[83] expressly "reserves the right to change, modify or discontinue any of the Plans at any time."[84] There is also no promise of lifetime, unchangeable benefits in any of the post–1985 plan documents. Plaintiffs attempt to circumvent this unambiguous language by arguing that the post–1985 plan described in New Directions II is inapplicable to retirees. According to plaintiffs, *no* formal document described the terms of the "retiree medical plan" for post–1985 retirees; instead, Armstrong's "policies, procedures, forms and informal communications" established and explained the retiree medical plan.

Although the New Directions II document, unlike the earlier SPDs and CG policies, does not specify whether its terms apply only to active salaried employees or to retirees as well, it provides that the CG policy will govern in light of any ambiguity, and the related CG insurance certificate in effect as of January 1, 1984 states that "If your Active Service ends because

---

77. Pl.'s 9(c)(2) Statement at ¶ 5.

78. 725 F.2d 1221, 1223 (9th Cir.1984).

79. Pls.' Memo. of Law at 47.

80. *See Joyce v. Curtiss–Wright Corp.*, 171 F.3d 130, 135 (2d Cir.1999) ("The absence of language ... flatly rejecting the concept of vesting does not alter the retirees' failure to identify language that affirmatively operates to imply vesting.").

81. *Id.*

82. *Id.*

83. The parties agree that the CG policy issued in 1984 is missing. However, defendant has produced a copy of the CG insurance certificate effective in 1984 describing the terms of this policy. Plaintiffs do not argue that the CG policy differs in any material way from the insurance certificate.

84. Pl.'s Ex. 38.

you retire: ... your Medical Insurance may be continued until your Employer stops paying premiums for you. See your Benefit Plan Administrator for details."[85] Thus, the CG certificate on its face contemplates potential continued benefits for retirees under that plan. Moreover, as defendant notes, plaintiffs claim a vested entitlement to the benefits that were in effect when they retired. Therefore, the absence of a separate plan for retirees does not suggest that there is no plan, but rather that they are covered under the terms that were in effect at the date of retirement, including the reservation of rights.[86]

In the face of the unambiguous language in the insurance certificate referencing application of the post–1984 medical insurance plan to retirees, the express reservation of rights in the New Directions document, and the absence of any language in either the certificate or the New Directions document providing for lifetime benefits for retirees, the post–1984 retiree plaintiffs—Taylor, Monko and McMunn—have not shown anything to permit a fact-finder to conclude that their retiree medical benefits were vested under the terms of the Plan.

### 3. Medicare Premium reimbursement

Defendant claims there was no ERISA welfare benefit plan governing Medicare B reimbursement created by the March 20, 1980 announcement letter, and that therefore its termination of the reimbursement

program in 1993 cannot be a violation of ERISA.

▮▮▮▮ Under ERISA, an "employee welfare benefit plan" includes "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits ...."[87] A " 'plan, fund, or program' is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits."[88] The plan need not be a formal, written document.[89]

Here, the intended benefit is, of course, the premium cost of medical coverage provided under Medicare Part B. The class of beneficiaries identified in the 1980 announcement letter are all pensioners and their spouses over age 65 who are currently enrolled in Medicare B. The letter clearly identifies the source of funding as the "the Company," and further describes the procedures to follow in order to receive the benefit. The letter, therefore, meets the criteria set forth in *Grimo*, and establishes a welfare benefit plan governed by ERISA.

The February 1983 application form also describes the benefit, the intended benefi-

---

**85.** Pl.'s Ex. 39 at 160018.

**86.** *See Byrnes v. Empire Blue Cross and Blue Shield,* No. 98 CIV. 8520, 2000 WL 1538605, *5 (S.D.N.Y. Oct.18, 2000) ("Without clear and express language to the contrary, it was only reasonable for plaintiffs to believe that if they retired while those SPDs were in effect that they would be entitled to the rights described therein.").

**87.** 29 U.S.C. § 1002(1).

**88.** *Grimo v. Blue Cross/Blue Shield,* 34 F.3d 148, 151 (2d Cir.1994) (*quoting Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir. 1982)).

**89.** *See id.*

ciaries, and indicates that "payment of this benefit will be on a monthly basis and will continue during the pensioner's lifetime."[90] The November 1989 application form, like the February 1983 form, identifies the benefit and the beneficiaries, and states that "[t]his benefit is payable for the lifetime of the retiree and/or spouse," although it does not indicate whether benefits are paid monthly or quarterly.[91] Both application forms detail the procedures to follow to receive the benefit.

 Defendant argues briefly that Medicare premiums are "manifestly" not included within the definition of "medical, surgical or hospital care or benefits." However, as Medicare premiums are payments to cover medical insurance, they constitute a medical "benefit."[92] Defendant also argues that the Medicare reimbursement plan does not meet ERISA's requirement of establishing an on-going administrative obligation, citing *Schonholz,* 87 F.3d at 75. The Second Circuit has identified a variety of factors to consider in determining when severance benefit plans are sufficiently complex to be deemed an on-going administrative scheme: whether the employer's obligation requires managerial discretion in its administration, whether a reasonable employee would perceive an ongoing commitment by the employer to pay benefits, and whether the employer had to analyze the circumstances of each employee's termination separately in light of certain criteria.[93]

In *Fort Halifax Packing Co. v. Coyne,*[94] the Supreme Court addressed the policy reasons supporting its conclusion that a one-time payment was not an ERISA plan:

> [T]he requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. . . . To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

The benefits at issue here are not provided as part of a severance package, most frequently a one-time event,[95] but instead as part of an on-going administrative program. Unlike the plaintiffs in *Fort Halifax,* retirees over 65 here participated in an on-going plan through which they submitted a copy of their Medicare B card and a completed application form, and then received quarterly, and later monthly, reimbursement checks for their premiums. This required defendant to assume an obligation to pay benefits on a regular basis, and put periodic demands on its assets. The application forms also indicated that

90. Pl.'s Ex. 51.

91. Pl.'s Ex. 52.

92. *See Randol v. Mid–West National Life Ins. Co. of Tenn.,* 987 F.2d 1547, 1550 (11th Cir. 1993) (program providing partial payment of medical insurance premiums for employees qualifies as ERISA welfare benefit plan because it provides a medical benefit); *Grimo v.*

*Blue Cross and Blue Shield of Vermont,* 899 F.Supp. 196, 202 (D.Vt.1995) (same).

93. *See id.* at 76 (citations omitted).

94. 482 U.S. 1, 12, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987).

95. *See, e.g., Hijeck v. United Tech. Corp.,* 24 F.Supp.2d 243, 247–51 (D.Conn.1998).

the Company would adjust the payment based on increases in the cost of Medicare Part B, thus requiring monitoring on the part of defendant. The Court is persuaded that this Medicare premium reimbursement plan meets the requirements of an ERISA plan.

The next step, again, is to determine whether benefits under that Plan were vested. Defendant argues that because no formal plan document, including the March 20, 1980 letter, mentioned vesting, plaintiffs have no claim to vested benefits. However, where an employer has created an ERISA plan through informal documents, the intent to vest benefits need not be memorialized in a formal plan.[96] Amendments to informal Plans will be considered binding where they are set forth "at the same level of formality that [the employer] chose in promulgating the [Plan] in the first place."[97]

While defendant maintains that the promissory wording of the application forms cannot bind it because "none of the forms bore the signature or other official imprimatur of any Armstrong of Pirelli official," both forms are on official letterhead and defendant has offered no evidence that the forms lacked Armstrong's authorization for personnel use. In light of the level of informality of the original 1980 plan letter, the Court finds that the application forms are prepared at a sufficiently similar degree of formality to constitute amendments to that plan.

Although the March 20, 1980 announcement letter that created the informal plan did not mention vesting, other communica-tions from defendant to employees consistently described the Medicare premium reimbursement benefits in terms indicating vesting.[98] The application forms prepared by defendant used vesting language such as "for the lifetime of the retiree and/or spouse." Further, a June 16, 1991 letter sent to plaintiff McElhannon by Kathy Ade, Employee Benefits Administrator, states, consistent with these application forms, that Medicare Part B premium reimbursement payments for plaintiff James McElhannon and his wife "will continue until each individual's death."[99] Defendant has provided no evidence that suggests that these forms are inauthentic, or that any forms or documents used by Armstrong in connection with this informal plan contained a reservation of defendant's rights to amend or terminate the plan. Further, defendant has not shown that after the March 1980 letter was mailed to pensioners who had retired as of that date, any documents other than the application forms revised February 1983 and November 1989 were used by defendant to communicate the terms of the Plan to retirees. The promises made in the application forms amended the original plan and are thus enforceable under ERISA as terms of the plan.[100]

In summary, defendant's use of language in the application forms it prepared for the Medicare reimbursement plan that "this benefit is payable for the lifetime of the retiree and/or spouse" created a vested benefit for all seven moving plaintiffs and the denial of further payment of such pre-

---

**96.** See Schonholz v. Long Island Jewish Med. Center, 87 F.3d 72, 78 (2d Cir.1996).

**97.** Id.

**98.** See American Federation of Grain Millers v. International Multifoods Corp., 116 F.3d 976, 982 (2d Cir.1997) (promise to pay cost bene-

fits for employees lifetime is a promise of vested benefits).

**99.** McElhannon Dec., Ex. A.

**100.** See Schonholz, 87 F.3d at 78.

miums by Pirelli in April 1993 violated ERISA, 29 U.S.C. § 1132(a)(1)(B).

### 4. Prescription Drug Coverage

 The 1977 SPD describing the prescription drug coverage policy expressly reserved Armstrong's rights to cancel or amend the plan at any time. Plaintiffs again claim that the plan documents governing this benefit include the 1976 PPD, which identifies prescription drug benefits as one of the benefits that retirees are eligible to receive under the plan. Because the 1976 PPD contains language that could be interpreted as promising prescription drug coverage to retirees for their lifetime, plaintiffs' argument goes, the PPD is necessary to interpret the prescription drug plan and should be read together with the SPD, which contains no such promissory language and indeed, expressly reserves the employer's right to terminate or amend the plan.

Plaintiffs have pointed to nothing within the text of the 1977 SPD that supports a claim of vested benefits.[101] Once again, the dispositive question is whether the absence of durational language in an ERISA plan creates an ambiguity as to vesting that permits or requires the Court to look to extrinsic evidence such as informal communications like the PPDs to interpret that plan. As discussed above, in the Second Circuit it does not. Accordingly, in the absence of vesting language in the formal document prepared by the company describing the prescription drug benefit, the 1977 SPD, the pre–1985 retirees have no claim of vested benefits under the plan.

Prescription drug coverage was also described in the 1984 New Directions II doc-

ument and the 1989 Employee Benefits Handbook, which contained express reservations of rights, and made no promises of lifetime benefits. For the reasons set forth above, the benefits of post–1985 retirees are governed by the terms of these documents, rather than the 1976 PPD.

As no documentation properly considered part of the prescription drug plan covering either the pre–1985 or post–1985 retirees even arguably provides for vesting of prescription drug benefits, defendant is entitled to summary judgment on this claim as to all moving plaintiffs.

### 5. Summary

In conclusion, plaintiffs have shown their entitlement to summary judgment on their claim that defendant violated the terms of an ERISA plan by discontinuing the Medicare premium reimbursement plan, as defendant unambiguously promised lifetime benefits and was therefore not permitted to terminate that program in 1993. In the absence of any material factual dispute as to the terms of that benefit plan, plaintiffs' motion for summary judgment is granted as to Medicare reimbursement. However, with respect to medical insurance benefits and prescription drug coverage, plaintiffs have failed to provide evidence showing either that benefits vested under the terms of those plans or that the terms of the plans are ambiguous as to vesting. Accordingly, defendants are entitled to summary judgment on plaintiffs' claims that defendant breached the terms of the plans, in violation of § 1132(a)(1)(B), by changing their medical insurance coverage and prescription drug plan in 1993.

---

**101.** Although plaintiffs argue that after the 1977 SPD "fell out of use," the 1976 PPD governed prescription drug benefits, nowhere do they explain when or how the SPD "fell out of use," and apart from the minor changes implemented in 1984, nothing in the record suggests that the 1977 SPD covering the prescription drug plan was in fact obsolete prior to 1984.

The Court now goes on to determine whether either plaintiffs or defendant have proven their entitlement to judgment as a matter of law on plaintiffs' alternative claim that defendant breached its fiduciary duty by promising lifetime benefits that were not, in fact, vested.

## C. Breach of Fiduciary Duty

■ ERISA requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries."[102] Under the Supreme Court's decision in *Varity Corp. v. Howe*,[103] individual beneficiaries may seek equitable relief for a breach of fiduciary duty under 29 U.S.C. § 1132(a)(3). Here, plaintiffs claim that if their rights to the medical benefits at issue here did not vest upon their retirement, defendant breached its fiduciary duty by misrepresenting to them that their benefits would continue for their lifetime during their retirement. Defendant responds that it is entitled to summary judgment on this count because no such material misrepresentations were made, or alternatively, that a factual dispute remains as to the existence and scope of any such misrepresentations. As the Court has concluded as a matter of law based on undisputed facts that only the Medicare B coverage vested, plaintiffs' argument here applies to the medical benefit plan and the prescription drug plan.

■■ To establish a claim for breach of fiduciary duty based on alleged misrepresentations concerning coverage under an employee benefit plan, plaintiffs must show: (1) that the defendant was acting in a fiduciary capacity when it made the challenged representations; (2) that these constituted material misrepresentations; and (3) that plaintiffs relied on those misrepresentation to their detriment.[104] Whether a misrepresentation is material is " 'a mixed question of law and fact' based on whether 'there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision . . . .' "[105]

### 1. Material misrepresentations

Plaintiffs argue that their claims here fall squarely within the holding of in *In re Unisys Corp. Retiree Medical Benefit ERISA Litigation.*[106] There, the Third Circuit found that where "virtually the entire company management had consistently misrepresented the [retirement] plan, not just on one occasion or to one employee, but over a period of many years both orally (in group meetings) and in writing (in newsletters) as well," retirees stated a claim for breach of fiduciary duty when the company changed their medical benefits contrary to its representations that such benefits would continue for the retirees

---

**102.** 29 U.S.C. § 1104(a).

**103.** 516 U.S. 489, 507, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).

**104.** *See Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996); *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 122, 126 (2d Cir.1997); *In re Unisys Corp. Retiree Medical Benefit ERISA Litig.*, 57 F.3d 1255, 1266 (3d Cir.1995).

**105.** *Mullins*, 23 F.3d at 669 (*quoting Fischer v. Philadelphia Elec. Co.*, 994 F.2d 130, 135 (3d Cir.1993)); *see also Larsen v. NMU Pen-*

*sion Plan Trust of the NMU Pension & Welfare Plan*, 767 F.Supp. 554, 558 (S.D.N.Y.1991) ("defendants are also liable for breach of fiduciary duty if they provided materially misleading information to [a beneficiary] or if the information supplied was insufficient to enable him to make an informed decision") (*quoting District 65, UAW v. Harper & Row, Publishers, Inc.*, 576 F.Supp. 1468, 1480 (S.D.N.Y.1983)).

**106.** 57 F.3d 1255, 1265–66 (3d Cir.1995).

lifetimes.[107] The district court had found that the company knew that employees accelerated their retirement plans because of a belief that by retiring at a certain date they would lock in their benefits, that the company did nothing to correct this misunderstanding and instead reinforced the misunderstanding by continuing to reassure employees that their medical benefits would continue for life upon retirement, that the company systematically informed employees that their benefits would continue for life without qualification, and finally that the company consistently responded to specific questions about whether retiree benefits could change by assuring employees that they could not.[108]

The Third Circuit held that under these circumstances, although the employer had expressly reserved the right to amend or alter the plan in its SPDs, recognizing a breach of fiduciary duty claim would not "conflict with our policy against informal plan modification."[109] The court also observed that the breach of fiduciary duty claim differs from the modification argument "because it requires different proof (proof of fiduciary status, misrepresentations, company knowledge of the confusion and resulting harm to the employees) than would be required for a contract claim that the plans had been modified." *Id.* Because the company failed to inform retirees, in response to specific questions, that their benefits could change, the court rejected the company's argument that it could not

be found liable for a breach of fiduciary duty because at the time lifetime benefits were promised to retirees, no one at the company knew or anticipated that they would ever be reduced.[110]

Defendant, in turn, argues that this case is more akin to *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Skinner Engine Co.,*[111] in which the Third Circuit found that where both employees and management had believed that their retirement benefits would continue for life, but there was no evidence that the company "affirmatively made representations to the effect that retiree benefits were vested and could never be modified or terminated by the company," no claim for breach of fiduciary duty could lie. The court there also noted that "there is no evidence that suggests that the company stood silent and failed to properly advise employees when specifically asked about the duration of retiree benefits. There is no indication that the company created the belief in the minds of the employees that the retiree benefits could never be changed or terminated."[112]

Defendant further cites *Sprague v. General Motors, Inc.,*[113] in which the Sixth Circuit rejected the claims of a group of GM retirees of entitlement to free, lifetime medical benefits. In denying the breach of fiduciary duty claim, the court noted

107. *Id.*

108. *Id.* at 1266.

109. *Id.* at 1265.

110. *Id.* at 1265 n. 15 ("Thus, while Unisys might not have anticipated ending the plans, it knew that it had the ability to do so and it knew that its employees were receiving answers to their specific inquiries that were vague, misleading and contradictory."); *see also Adams v. Freedom Forge Corp.,* 204 F.3d 475, 493–94 (3d Cir.2000) (Where the company "was aware that it retained the right to modify [a retirement plan], a knowing failure to clarify the material information about the retention of power was a breach of its fiduciary duty.").

111. 188 F.3d 130, 150–51 (3d Cir.1999).

112. *Id.* at 150 (emphasis added).

113. 133 F.3d 388 (6th Cir.1998) (en banc).

that "GM never told the early retirees that their health care benefits would be fully paid up or vested upon retirement. What GM told many of them, rather, was that their coverage was to be paid by GM for their lifetimes. This was undeniably true under the terms of GM's then-existing plan." [114] The court concluded that "GM's failure, if it may properly be called such, amounted to this: the company did not tell the early retirees at every possible opportunity that which it had told them many times before—namely, that the terms of the plan were subject to change." [115] However, the court also observed that *"[h]ad an early retiree asked about the possibility of the plan changing, and had he received a misleading answer,* or had GM on its own initiative provided misleading information about the future of the plan ... *a different case would have been presented."* [116]

Plaintiffs emphasize the importance of the duty to convey truthful, accurate information owed to beneficiaries by fiduciaries, and argue that to prevail on their breach of fiduciary duty claim they only need to show that defendant misrepresented to them that their retiree medical benefits would continue for their lifetimes. According to defendant, however, permitting an informal representation of lifetime benefits to modify the terms of an ERISA plan, however, is barred by the Second Circuit's holding in *Moore* and the policy concerns outlined in that case.

 To respond to these competing concerns, other circuits have focused on whether the employer misled employees when specifically asked about the duration of retiree benefits, or made promises that

retiree medical benefits could not be changed in the future, despite the fact that the Plans at issue did not provide for vested benefits. [117] Although this Court does not speculate as to whether the outcome in *Moore* would have differed had a breach of fiduciary duty claim been alleged, the Court concludes that limiting recovery for a breach of fiduciary duty based on misrepresentations to those circumstances where an employer has provided affirmatively misleading information that contradicts the terms set forth in ERISA Plan documents or gives misleading, inaccurate or untruthful information in response to a specific inquiry from an employee about the duration of benefits or the possibility of future change balances the employees' need for accurate, truthful information from their fiduciary and the employer's interest in predictability as to its obligations.

 Consistent with *Moore,* an employer will not incur liability simply by providing informal communications, as long as those informal communications do not constitute affirmative misrepresentations. However, where an informal communication creates ambiguity when read together with the terms of the plan and the employee requests clarification of the terms of the plan and is given misleading information by the employer in response to that specific inquiry, the employer's conduct may give rise to a breach of fiduciary duty. Similarly, where an employer affirmatively contradicts material terms of an ERISA plan when communicating, even informally, with beneficiaries who rely on the plan fiduciary for truthful information, it fails to "discharge [its] duties with re-

114. *Id.* at 405.

115. *Id.*

116. *Id.* at 406 (emphasis added).

117. *See Skinner,* 188 F.3d at 150–51; *Unisys,* 57 F.3d at 1265–66; *Sprague,* 133 F.3d at 406.

spect to a plan solely in the interest of the participants and beneficiaries."[118] If such employees detrimentally rely on the material misrepresentations made by a fiduciary, a breach of fiduciary duty claim may lie under ERISA notwithstanding the bar on informal plan modification.

It is undisputed that prior to April 1993, defendant had a "policy" of covering retirees in the same fashion as they were covered at time of retirement for the duration of retirement and fully intended to maintain that policy. The parties further agree that such a policy existed at the time each of the moving plaintiffs retired, and that they were aware of the policy. Finally, there is no apparent dispute that misrepresentations regarding duration of medical insurance are material, in that there is a "substantial likelihood that [they] would mislead a reasonable employee in making an adequately informed retirement decision."[119] The dispute here is whether this policy was stated in terms that constituted an affirmative misrepresentation by defendant that it would not exercise its right to alter or terminate these benefits during the retiree's lifetime and until the death or remarriage of his spouse, or was simply a description of then-current policy and intention, which as a matter of law could be changed at a later date absent vesting language.

Although defendant is correct that it had no obligation to "forecast the future,"[120] it nonetheless had a fiduciary duty to truthfully answer plaintiffs' questions about the possibility of changes to their benefit plans after retirement.[121] Moreover, this duty prohibited it from conveying materially misleading or inaccurate information about benefits to employees. The resolution of this claim thus turns on what inquiries were made by plaintiffs, and what representations, or misrepresentations, were made by defendant in response to those inquiries.

Even under the narrowest reading of the relevant case law, any employees who were expressly told by a person acting in a fiduciary capacity that their retirement benefits could not be changed during retirement received affirmative misrepresentations.[122] In contrast, the simple statement by a fiduciary that benefits "will continue in retirement" without any durational limit is not a material misrepresentation because the statement is neither untrue or misleading, and could not create a reasonable expectation that benefits had vested.

More difficult to categorize are the alleged representations by Armstrong/Pirelli that benefits would continue during retirement for the lifetime of the plaintiffs. The Third and Sixth Circuits appear to have parted company on whether such promises constitute misrepresentations. In *Sprague*, the Sixth Circuit held that such promises were not misleading because the employer had clearly reserved its right to amend the plan and "never told the early retirees that their health care benefits would be fully paid up or vested upon retirement. What GM told many of them, rather, was that their coverage was to be paid by GM for their lifetimes. This was undeniably true under the terms of GM's

118. 29 U.S.C. § 1104(a).

119. *Unisys*, 57 F.3d at 1264.

120. *Sprague*, 133 F.3d at 406.

121. *See Mullins*, 23 F.3d at 668 ("when a plan administrator speaks, it must speak truthfully") (citation and internal quotation omitted).

122. *See Unisys*, 57 F.3d at 1265–66; *Sprague*, 133 F.3d at 406; *Skinner*, 188 F.3d at 151.

then-existing plan."[123] Similarly, in *Byrnes v. Empire Blue Cross and Blue Shield*,[124] the court held that there was no breach of fiduciary duty as a matter of law where Empire had allegedly represented that retiree life insurance would remain constant for the remainder of the plaintiffs' lives, although the SPDs contained express reservations of rights. The court ruled that because "there was no indication that the representations that plaintiff cite as being dishonest did not sincerely represent the intentions of Empire at the time those representations were made," and there is no duty under ERISA to disclose contemplated changes, Empire's descriptions of benefits as "lifetime" was not misleading or dishonest, and instead "described the plan accurately by setting forth what it intended to offer to retirees while expressly reserving the right to amend or terminate the benefits."[125]

In contrast, in *Unisys*, the Third Circuit rejected the argument that representations that benefits would continue for an employee's lifetime were simply true statements of then-current policy, finding a breach of fiduciary duty where "some individuals specifically asked if their benefits would continue for life and were told they would, without any mention of the reservation of rights clauses ... [and] Unisys was aware of the retirees' confusion regarding the applicability of these clauses to their benefits and the retirees' mistaken belief that their benefits could not be terminated once an employee retired."[126]

The analysis and outcome of these cases illustrates that the particular context in which representations are made is crucial to assessing whether a representation about the duration of benefits is accurate or misleading. Where, as in *Sprague* and *Byrnes*, clear reservations of rights are used consistently in the plan documents, employees reasonably should have been aware that their retiree benefits were subject to change, and a company is not required to "begin every communication ... by restating the caveat that it had reserved the right to change the ... plan."[127] However, where a company has deliberately fostered the belief that retirement benefits are lifetime benefits, and is aware that its employees incorrectly—if understandably—believe that their medical benefits will continue unchanged for the duration of their retirement, this Court agrees with the Third Circuit that a reservation of rights in an SPD does not insulate the company from its obligation to provide "complete and accurate information."[128]

As discussed in greater detail below, there is unrebutted evidence in the record here supporting plaintiffs' contention that Armstrong, and then Pirelli, consistently and deliberately fostered the belief that benefits would be lifetime benefits through the use of the 1976 PPD and verbal communications. Further, plaintiffs claim never to have received the SPDs or insurance certificates with the reservation of rights, and although defendant

---

123. 133 F.3d at 405.

124. No. 98 CIV. 8520, 2000 WL 1538605, *9 (S.D.N.Y. Oct.18, 2000).

125. *Id.*

126. 57 F.3d at 1265, n. 15; *see also Skinner*, 188 F.3d at 150–51 (rejecting breach of fiduciary duty claim where "there is no evidence

that suggests that the company stood silent and failed to properly advise employees when specifically asked about the duration of retiree benefits").

127. *Byrnes*, 2000 WL 1538605 at *9 (citing *Sprague*, 133 F.3d at 405).

128. *Unisys*, 57 F.3d at 1265, n. 15.

states that company policy required the distribution of the certificates and SPDs, nowhere does defendant point to anything in the record suggesting that these documents actually were distributed to the moving plaintiffs.[129] In the absence of a clear and communicated reservation of rights, if plaintiffs were told by defendant when they retired that they and their spouses would receive the same benefits they had at the date of retirement until their death and then the death or remarriage of their spouses, they reasonably would conclude, as plaintiffs here claim to have done, that those benefits would remain unchanged for the rest of their lives. To require employees under these circumstances to follow up by specifically asking whether their benefits could change would be unreasonable, as death is a clearly understood term of duration. Instead, the Court agrees with the Third Circuit in *Unisys* that by continuing to assure plaintiffs that they would receive the same benefits in retirement until their death without reference to the reservation of rights, defendant failed to convey complete and accurate information, and instead provided materially misleading information. These general principles guide the application of the law to the seven moving plaintiffs.

Plaintiff Dominic Annatone worked for Pirelli at the West Haven plant from 1952 until 1981 when the plant closed. In 1956, he became a salaried employee, and was told by Joseph Colantonio, the head of the personnel department at the West Haven plant, that as a salaried employee, his benefits would be the same as the union benefits, and that he would get the same medical benefits through his retirement.[130] Before he retired in 1981, Annatone claims that he was told during a group meeting that the West Haven plant was closing and that if he retired, "as far as health benefits, we were supposed to get all the same, all the same health benefits that we received now, then. . . . I took it for granted that it would be for the rest of my life, following retirement, when I retired. And [Joseph Colantonio] said the same thing." [131] Plaintiff Annatone does not claim that he ever specifically asked whether his benefits could change during retirement or that Colantonio or any other representative of defendant informed him that the company's policy of providing benefits throughout retirement was not subject to change.

Colantonio, who conducted exit interviews with employees including Annatone, stated during his deposition that he told retiring employees that "the benefits that were in effect at the time of the retirement were those benefits that would be afforded to them after they retired." [132] In fact, Colantonio confirmed that employees were told that medical benefits would be provided "from the womb to the tomb," and that [w]e were proud of that fact and we used that as a recruiting tool. [133] Colantonio also testified that he never informed retirees that their benefits could be changed during retirement and was not aware of any reservation of rights with respect to

---

**129.** Moreover, with respect to the pre–1985 retirees, the "reservation of rights" language in the medical benefits plan is far too ambiguous to have given those plaintiffs sufficient notice that their benefits could be changed during retirement. *See supra* note 76.

**130.** *See* Annatone dep. at 9–10; Colantonio dep. at 38–45.

**131.** Annatone dep. at 12–13.

**132.** Colantonio dep. at 39, 44–45.

**133.** *Id.* at 103; *see also id.* at 44 (employees were told during the retirement presentation that they would have health benefits "from the womb to the tomb").

retiree medical benefits.[134] Annatone similarly stated that he never received any SPD or certificate containing a reservation of rights.

Plaintiff James McElhannon was employed by Pirelli from 1963 until 1983 at the Hanford, California plant. He became a salaried employee after three months as an hourly employee, and was informed that his benefits would continue "to and through [his] retirement until death."[135] In 1983, McElhannon wrote to Hoppert to inquire about his benefits at retirement.[136] Hoppert called McElhannon in response to that letter.[137] When McElhannon asked Hoppert what his medical benefits would be at retirement, McElhannon claims Hoppert answered that "they would remain the same as they were when [he] retired ... He stated that my wife and I both would be insured until death."[138] Hoppert similarly stated in his deposition that he informed employees that they "would expect to receive the medical benefits during [their] retirement that [they were] receiving as an active employee, except for dental and vision and the levels of life insurance."[139]

Plaintiff William McMunn worked at the Pirelli plant in Hanford, California from 1962 until 1990, when he retired under the OPS program. When he became a salaried employee six months after he began working, he was told that "if I kept my nose clean and stayed with the company until I retired, that I would have these benefits during my retirement for a lifetime, the way they worked on the day I retired."[140] When he retired, McMunn was an Assistant Employee Relations Manager. He had read the PPDs, including the 1976 PPD that contained language suggesting that benefits would vest at retirement, and had never received any documents that indicated that his benefits could be changed after retirement.[141] Eugene Avila, the Employee Relations Manager, first told McMunn about the OPS retirement plan in July 1990; in describing the benefits of the plan, Avila informed McMunn that by retiring under the OPS, McMunn could "lock-in" his medical benefits for life, and would not be affected by the proposed increase in deductibles in 1991 or in the future.[142] McMunn then assisted Avila in recruiting other salaried employees to retire, using the promise of locked-in benefits as an incentive.[143]

Plaintiff Alexander Monko worked for Pirelli in West Haven and New Haven, Connecticut from 1960 until 1990, when he retired under the OPS plan. Like the other plaintiffs, he believed that retiree benefits would remain the same from the date of retirement until the death of the retiree.[144] At the time the OPS plan was instituted in 1990, Monko did not believe that he was eligible for retirement with full benefits.[145] After a presentation by Elizabeth Sturgess from the Industrial Relations Department (later renamed Human Resources) describing the benefits of the

---

134. *Id.* at 44–45.

135. *See* McElhannon dep. at 17–18.

136. *Id.* at 28–30.

137. *Id.* at 32.

138. *Id.* at 33.

139. Hoppert dep. at 122.

140. McMunn dep. at 10–11.

141. *Id.* at 18–19, 31–32.

142. *Id.* at 67–72, 75.

143. *Id.* at 82–83.

144. Monko dep. at 11–12.

145. *Id.* at 21.

OPS program, Sturgess approached Monko, who informed her that he did not intend to participate.[146] Sturgess responded that he "would be able to get an unreduced pension ... and you would also get the medical benefits frozen or locked-in."[147] Based on this representation, Monko decided to take the OPS in part to lock-in his and his wife's medical benefits, and signed up for the OPS program the next day.[148]

■ Plaintiff John Taylor was employed by Pirelli from 1948 until 1985, when he retired under an early retirement program, the Special Voluntary Severance Program ("SVSP"). Taylor stated in his deposition that at the time he signed up for the SVSP, he asked Joyce Phillips, the Manager of Corporate Personnel and Office Services, "to reassure me that the benefits were going to continue, to my understanding, for the rest of my life and my wife's life, and [Phillips] told me that they would—that they would not be changed."[149] The letter sent to employees describing the SVSP by Armstrong president Paul James instructed employees to contact Joyce Phillips if they had any questions about the program.[150] Before speaking with Phillips, Taylor believed that his benefits would not change, but he wanted to "triple check" before making a "very major step," so he "went back to the source to make sure there would be no change."[151] Taylor stated that he was not told that the company reserved its rights to change the plan until 1993 when it instituted the changes giving rise to this litigation.[152] Instead, Taylor was reassured by Joyce Phillips, the employee indicated by the company president on the SVSP announcement letter as the source for answers to any questions about the program, that benefits could not change.[153]

Plaintiff Melton Walker worked for Pirelli from 1956 until his retirement in 1984. In 1963, he became a salaried employee, and was told by Ray Hurst, the personnel manager at the Natchez, Mississippi plant, that as a salaried employee, his benefits were guaranteed for life, while union benefits were not.[154] Guaranteed medical benefits were "one of the bigger deciding factors" that convinced Walker to take the salaried position, because the pay was comparable and he earned overtime as a union employee.[155] Walker was transferred to the plant in Laurel Hill, North Carolina in 19734, and was made Manufacturing Manager.[156] In that position, he assisted with hiring new employees, and

---

146. *Id.* at 25–26.

147. *Id.* at 26–27.

148. *See id.* at 28–30.

149. Taylor dep. at 61–63.

150. *See* Pl.'s Ex. 85.

151. *Id.* at 63.

152. *Id.* at 66–67.

153. *Id.* at 63. Defendant also claims that because Ms. Phillips "may now be deceased," testimony as to her statements may be barred by the Dead Man's Statute, Conn. Gen.Stat. § 52–172. In the absence of any evidence that Ms. Phillips *is* deceased, however, the Court does not find this argument persuasive. More importantly, however, the Connecticut Dead Man's Statute does not bar testimony but rather is an exception to state hearsay rules that provides for the admission of statements of deceased persons under certain circumstances "to create an equal footing between the living and the dead parties." *Rosales v. Lupien,* 50 Conn.App. 405, 407, 717 A.2d 821 (1998). It thus has no bearing on the admissibility of the statements by Ms. Phillips.

154. *See* Walker dep. at 19–20.

155. *Id.* at 18–21.

156. *Id.* at 27–28.

was told by the Plant Manager, Charles Miles, to "emphasize the fact that if they stayed until they retire, they had this benefit package that was in effect the rest of their life, for them and their spouse." [157] Walker reviewed the PPDs, and claims that he never saw either the SPDs or the CG policies.[158] When Walker retired, he believed his benefits would remain in effect without change for the rest of his life.[159]

Plaintiff Billy Young was employed by Pirelli from 1949 until 1983, when he retired. From 1949 to 1966, he worked at the Natchez plant as an hourly employee; he was asked to transfer to the Hanford, California plant to a management position in 1966.[160] At that time, he was told that if he transferred to management that his medical benefits "would be paid for my life and for my spouse for her life ... or until she remarried." [161] Young did not agree to move immediately, but in January 1967, he agreed to move his family to California.[162] He stated that "the main reason I decided to transfer was the paid medical benefits and the guarantee that Armstrong would pay those benefits." [163] In 1983, Young decided to take early retirement after Hoppert informed him that he was eligible for full retirement.[164] Hoppert told Young at that time that he "would have medical benefits paid by Armstrong Rubber Company until I died and my wife would have them until she died or if I died first that she would have them until she remarried." [165] Prior to 1993, Young never

heard or saw anything that indicated that defendant reserved its right to change or cancel his benefits after he retired.[166]

Defendant initially objects to the reliability of much of plaintiffs' evidence as resting on their recollection of conversations that happened long in the past and insists that a trial would be necessary to resolve the credibility issues raised by such testimony. However, plaintiffs were deposed, and defendant had an opportunity to cross-examine them regarding the accuracy of their recollection. Defendant has pointed to no evidence in the record that suggests that the moving plaintiffs did not accurately report the substance of their communications with defendant regarding the early retirement programs.

Defendant also argues that testimony from Harold Hoppert, the vice president of employee relations, creates at a minimum a triable issue of fact as to whether these retirees received misleading oral promises. However, Hoppert's deposition testimony describing the use of SPDs and PPDs does not create any issue of disputed fact with respect to what the plaintiffs were told by other employee relations employees. The only arguably disputed fact created by Hoppert's testimony relates to whether plaintiffs received the SPDs, which Hoppert claimed were distributed to salaried employees.[167] Even assuming that the pre–1985 retiree plaintiffs had received the 1976 SPD, however, the reservation of rights language used in that plan was insufficiently specific as a matter of law to

157. *Id.* at 33.

158. *Id.* at 104–05, 114.

159. *Id.* at 46.

160. Young dep. at 7–12.

161. *Id.* at 12.

162. *Id.* at 13–15.

163. *Id.* at 15, 16–17.

164. *Id.* at 20–21.

165. *Id.* at 21.

166. *Id.* at 52.

167. *See* Hoppert dep. (vol.2) at 203.

convert defendant's consistent misrepresentations about the duration of retiree benefits into permissible representations. In addition, the Court notes that Hoppert himself testified that he relied on the 1976 PPD, rather than the certificates or SPDs, when describing the terms of the plan to employees.[168] Although the SPD for the post–1985 medical benefits plan did contain a more explicit reservation of rights, in the context of the consistent misrepresentations received by the post–1985 retirees about the duration and unchangeability of their retiree benefits plan, both prior to and at the time of their retirement, the Court finds that defendant has failed to create a triable issue of material fact as to whether the promises of unchanging lifetime medical benefits were misrepresentations.

Defendants also point to deposition testimony of Hoppert given in the *Allen v. Pirelli Armstrong Tire Corp.*, 4–94–CV–10549 litigation, which states that "with the exception of the OPS Program, there was nothing that came out of my office that would have anything to do with the length of time that retirees would receive medical benefits."[169] However, even drawing all inferences in defendant's favor, Hoppert's testimony that nothing came out of his office in California does not create a triable issue of fact as to what the moving plaintiffs were told by various personnel managers, in response to specific questions, about the duration of their benefits and the possibility of future changes during their exit interviews.

■ Defendant also argues that the statements by various Armstrong/Pirelli employees regarding the company's intent to provide unmodified benefits to retirees lack proper foundation as admissions of a party opponent because the plaintiffs have not proved that the speakers were authorized to speak for the company at the time the alleged conversations occurred. However, the communications plaintiffs rely on were made by personnel managers or other human resources personnel with supervisory capacity, who were operating within their ordinary job duties when communicating with employees regarding the terms of retiree benefits.[170] They therefore would be admissible as statements offered against a party made by a party's agent concerning a matter within the scope of employment under F.R.E. 801(d)(2)(D), such evidence may properly be relied upon to form the basis for summary judgment.[171]

### 2. Representations by fiduciary

■ To prevail, plaintiffs must also show that the misrepresentations were made by a person acting in a fiduciary capacity.[172] In *Varity Corp. v. Howe*,[173] the Supreme Court concluded that "[c]on-

---

168. *See id.* at 145–46.

169. McGuire Aff. Ex. 2, at 52 (emphasis added).

170. *See, e.g.,* Pl.'s Statement of Undisputed Facts at ¶¶ 156–63 (Plaintiff Monko told by Elizabeth Sturgess, supervisor in Industrial Relations Department, that he would lock-in his medical benefits if he retired under the OPS); *id.* at ¶¶ 105–22 (Plaintiff McMunn told by Eugene Avila, Employee Relations Manager, that if he retired under the OPS he would lock-in medical benefits); *id.* at ¶¶ 189–194 (Plaintiff Taylor told by Joyce Phillips, Manager of Corporate Personnel and Office Services, that there would be no change in health benefits during retirement).

171. *See* Fed.R.Civ.P. 56(e) (affidavits supporting motion for summary judgment "shall set forth such facts as would be admissible in evidence").

172. *See Becker,* 120 F.3d at 7–8.

173. 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).

veying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of a power 'appropriate' to carrying out an important plan purpose." [174] The *Varity* Court found further support for its conclusion that the employer was acting in a fiduciary capacity when it misled participants about the security of future benefits from the fact that the misrepresentations at issue "came from those within the firm who had authority to communicate as fiduciaries with plan beneficiaries." [175] Similarly, plaintiffs here assert that various human resources officials made material misrepresentations regarding the terms of their medical benefits in retirement.

Annatone received misrepresentations at a group presentation on benefits and from Joseph Colantonio, the Industrial Relations Manager. McElhannon and Young both received incorrect information regarding their benefits directly from Harold Hoppert, the Vice President of Employee Relations. Misrepresentations were made by Eugene Avila, the Employee Relations Manger, to McMunn. Monko was misinformed about his benefits by Elizabeth Sturgess during an Industrial Relations Department presentation about benefits. Taylor spoke to Joyce Phillips, the person identified by defendant as the source of information regarding employee benefits under the retirement plan. Finally, Walker was told by his plant manager that retiree medical benefits were lifetime benefits and instructed to emphasize that fact during recruiting.

As plaintiffs have identified specific high-level employees responsible for the misrepresentations about the duration of retiree medical benefits and defendant has not set forth any evidence in rebuttal, the Court finds that the moving plaintiffs have shown that they received material misrepresentations from fiduciaries.

### 3. Detrimental reliance

 Finally, plaintiffs must prove that they detrimentally relied on the misrepresentations. Although all plaintiffs clearly assumed that their benefits would continue unchanged for their lifetime, only the early retirees, Monko, McMunn and Taylor, who claim that they would have continued working but for the specific promise of locked-in benefits made to them when they retired, have demonstrated that they detrimentally relied on the misrepresentation of lifetime benefits as a matter of law. The remaining plaintiffs have not shown that had they been told the truth when they retired—that their benefits could change—that information would have made a difference. Accordingly, the Court leaves for the damages phase the question of what equitable relief Monko, McMunn and Taylor are entitled to, and whether the remaining plaintiffs can establish that they are entitled to equitable relief because they detrimentally relied on the misrepresentations by defendant.

### D. Promissory Estoppel

Plaintiffs finally argue that to the extent that any of their medical benefits have not vested, defendant is estopped from denying them these benefits because of its past representations.

 In order to prevail on a claim of promissory estoppel, plaintiffs must show: (1) a promise, (2) reasonable reliance on that promise, (3) injury caused by the reliance, and (4) an injustice if the

---

**174.** *Id.* at 502, 116 S.Ct. 1065.

**175.** *Id.* at 503, 116 S.Ct. 1065.

promise is not enforced.[176] To meet the first requirement, plaintiffs must "demonstrate a promise that [defendant] reasonably should have expected to induce action or forbearance on [their] part." [177] In addition to these four requirements, plaintiffs also must show that there are "extraordinary circumstances" justifying the application of estoppel in an ERISA case.[178] In *Devlin v. Transportation Communications International Union*,[179] the Second Circuit elaborated on what constitutes "extraordinary circumstances." The court emphasized that detrimental reliance alone would not render a case extraordinary, as it was one of the basic elements of estoppel.[180] The court also noted that extraordinary circumstances were found in *Schonholtz* because the defendants had used the promise of severance benefits as an inducement to persuade the plaintiff to retire, and had then reneged as soon as she resigned.[181] Because the *Devlin* plaintiffs offered "no evidence to suggest that appellees sought the retirement of any of the appellants, or that the promise of free, lifetime health benefits was used to intentionally induce any particular behavior on appellants' part," the court concluded that they had not shown sufficiently extraordinary circumstances.[182]

■ Defendant argues that it is entitled to judgment as a matter of law on the estoppel claim because none of the plaintiffs can show sufficiently extraordinary circumstances to entitle them to benefits under a theory of estoppel. However, plaintiffs Monko and McMunn, who retired as part of the 1990 OPS, and plaintiff Taylor, who retired under the SVSP, have provided precisely the type of evidence that the *Devlin* court found lacking: defendant sought their retirement and intentionally used the promise of vested medical benefits to induce these plaintiffs to retire early. Having reaped the benefit of these plaintiffs' early retirement, defendant cannot now renege on those promises.

Defendant instituted the OPS in order to persuade salaried employees to retire in 1990, and plaintiffs McMunn and Monko have provided evidence that they were explicitly told that they could lock-in their current medical benefits if they retired as part of the OPS, as an incentive to encourage them to do so.[183] Plaintiff Taylor, who retired under the SVSP early retirement program in 1985, stated in his deposition that he would not have retired in 1985 if he had not believed that his medical benefits would remain undiminished, but instead would have worked seven additional years until he reached age 65.[184] Thus, defendant induced Taylor's early retirement based on express promises of unchanging benefits. These three plaintiffs have therefore established the type of extraordinary circumstances required in this Circuit to pursue their estoppel claims.

■ The other moving plaintiffs state in their declarations that they were told that their benefits would continue for their

---

176. *See Schonholz*, 87 F.3d at 79.

177. *Id.*

178. *Id.* at 78.

179. 173 F.3d 94, 101–02 (2d Cir.1999).

180. *Id.* at 102.

181. *Id.*

182. *Id.; see also Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 154 (2d Cir.1999) (extraordinary circumstances could be established where employer "made a promise to [the employee] in order to induce him to take action for [its] benefit only later to renege on the promise").

183. Plaintiffs were aware that if they did not retire before 1991 their deductible and co-pay would increase significantly.

184. *See* Taylor dep. at 31–32, 61–63, 129–30.

lifetimes, but none of them were encouraged to retire early by defendant's promises of lifetime benefits. Plaintiffs Walker and Young claim that defendant used the promise of vested medical benefits to encourage them to leave union or hourly positions for salaried jobs, and to remain with the company until retirement. The remaining plaintiffs, Annatone and McElhannon, have not alleged that defendant promised them lifetime benefits in order to induce any specific behavior, apart from ensuring their continued employment. Virtually any benefit promised by an employer could be characterized as offered to induce employees to work for or stay with that employer. The benefits claimed by plaintiffs Annatone, McElhannon, Walker and Young were offered in the regular course of defendant's business, and were not intended to induce any particular action on behalf of these plaintiffs. Allowing this type of claim to rise to the level of "extraordinary circumstances" would convert every case in which an employer promised a benefit and then later ceased providing it into a potential estoppel case.[185] Accordingly, the Court finds that defendant is entitled to summary judgment on McElhannon, Walker, Young and Annatone's estoppel claims.

■■■ Defendant also claims that plaintiffs cannot prove that their reliance was reasonable, given the alleged reservations of rights in the ERISA plans. As discussed above, all moving plaintiffs deny receiving the SPDs or other documentation containing a reservations of rights. Moreover, plaintiffs contend they were expressly told that their benefits would continue for their lifetime, and the PPDs,

which at least some of the plaintiffs reviewed, and other written communication from the defendant suggested as much. Accordingly, the Court finds that defendant is not entitled to summary judgment as to the estoppel claims of Monko, McMunn and Taylor.

The Court finds that plaintiffs Monko, McMunn and Taylor have established sufficient extraordinary circumstances to permit their promissory estoppel claim to go forward. They have also provided undisputed evidence of promises made by Armstrong and Pirelli officials that benefits would remain in place through retirement. The Court is also persuaded that their reliance on those promises by taking early retirement or not otherwise planning for additional medical expenses was reasonable, even assuming these plaintiffs received the plan documents with the reservation of rights, because the specific promises of unchanging lifetime benefits were made in the context of the early retirement programs in response to plaintiffs' questions about the terms of those programs. Thus, the Court finds plaintiffs' belief that these promises governed the benefits they would receive in retirement reasonable. The injury plaintiffs Taylor, Monko and McMunn have suffered as a result of their reliance, and whether an injustice would result if the promises are not enforced awaits determination at the damages phase trial.

## IV. Conclusion

Defendant's cross-motion for summary judgment is GRANTED IN PART and DENIED IN PART. The motion is granted as to the § 1132(a)(1)(B) claims of all moving plaintiffs for lifetime medical bene-

---

**185.** *See Byrnes v. Empire Blue Cross and Blue Shield,* No. 98 CIV. 8520, 2000 WL 1538605, *10 (S.D.N.Y. Oct.18, 2000) ("Plaintiffs' decision to work for or stay with Empire does not constitute an inducement satisfying the extraordinary circumstances requirement. If the Court were to consider it extraordinary every time an employee chose a job based in part of the quality of an employer's benefits package, the requirement of extraordinary circumstances would lose all meaning.").

fits and prescription drug coverage as terms of the plan, and as to the estoppel claims of plaintiffs McElhannon, Walker, Young and Annatone. The motion is denied as to the § 1132(a)(1)(B) claims for Medicare reimbursement of all moving plaintiffs, the breach of fiduciary duty claims under § 1132(a)(3) of all moving plaintiffs, and the estoppel claims of plaintiffs Taylor, Monko and McMunn.

The seven moving plaintiffs' cross-motion for summary judgment is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to the § 1132(a)(1)(B) claim for Medicare reimbursement as a term of the plan and as to plaintiffs Taylor, Monko and McMunn's claims of breach of fiduciary duty and promissory estoppel. The motion is denied as to the § 1132(a)(1)(B) claim for medical insurance and prescription drug coverage, and as to plaintiffs McElhannon, Walker, Young and Annatone's breach of fiduciary duty and estoppel claims.

IT IS SO ORDERED.